MOORHEAD ECONOMIC
DEVELOPMENT AUTHORITY,
Respondent,

v.

Roger W. ANDA, et al., Appellants,

Kjos Investments, Respondent Below.

No. A07–1918, A07–1930.

Supreme Court of Minnesota.

Sept. 2, 2010.

Rehearing Denied Nov. 12, 2010.

John T. Shockley, Ohnstad Twichell, P.C., West Fargo, ND, for respondent.

Roger J. Minch, Serkland Law Firm, Fargo, ND, for appellant.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae, League of Minnesota Cities.

Bradley J. Gunn, Howard A. Roston, Malkerson Gilliland Martin LLP, Minne-

apolis, MN, for amici curiae, Howard A. Roston and Bradley J. Gunn.

## OPINION

ANDERSON, PAUL H., Justice.

In March 2001 the Moorhead Economic Development Authority (MEDA) exercised its condemnation power to take Roger W. Anda's commercial property as part of a redevelopment project. The project area included Anda's property and more than 20 other nearby properties. After taking title to and possession of Anda's property through a quick-take procedure, MEDA and the property's developer, Moorhead Holiday Associates (MHA), discovered fuel-oil contaminated soil on Anda's property and two adjoining properties. Under contractual time pressure to deliver Anda's property and the adjoining properties to a franchise developer, MHA acted quickly to remediate the contaminated properties. The remediation process for the three properties took approximately one week to complete and cost $1,599,568.

Court-appointed commissioners subsequently awarded Anda $488,750 as compensation for the taking of his property. Both Anda and MEDA appealed the commissioners' award to the Clay County District Court. MEDA also commenced a separate action against Anda to recover damages for the cost of remediating the contamination discovered on the two adjoining properties, which MEDA alleged was a result of fuel oil leaking from Anda's property. The parties agreed to consolidate the actions. At trial, the jury found Anda's property was worth $455,000 "had it not been impaired by fuel oil contamination" and $0 "taking into account the fuel

oil contamination." The jury also found Anda liable for the contamination of the two adjoining parcels in the amount of $474,512. The court then concluded that Anda was not entitled to damages for the taking of his property because the cost of remediating Anda's property exceeded the property's fair market value.

The district court denied Anda's motions for a new trial and judgment as a matter of law. Anda appealed this denial and the district court's judgment to the court of appeals. Anda raised three issues on appeal. He challenged the valuation of his property on the date of the taking; he challenged the judgment of liability for the contamination of the two adjoining properties; and he asserted that the district court's rulings denied him a fair trial. The court of appeals affirmed. We reverse the court of appeals and hold Anda is entitled to a new trial on the issues of the value of his property on the date of taking and the damage award for remediation of the two adjoining properties.

### Anda's Property

Appellant Roger W. Anda owned a parcel of real property located next to Interstate Highway No. 94 in the City of Moorhead, Minnesota, commonly referred to as the Holiday Office Park. The Holiday Office Park contained a commercial office building built sometime in the 1960s. The building was an elevated glass and stucco structure supported by steel stilts. A mechanical room and a paved parking lot were on the ground level underneath the elevated part of the building. The building housed business tenants and produced significant income for Anda even though it was no more than 40 percent occupied at the time relevant to this dispute.[1]

---

1. Anda asserts that rents and occupancy of the office building on his property were increasing until members of the community heard that MEDA intended to acquire and redevelop property north of Interstate High-

way No. 94 and east of Eighth Street. Additionally, existing renters began to leave once they heard Anda's property was about to be condemned.

In 1972, Anda purchased a 25 percent interest in the Holiday Office Park property. At that time, three other individuals had an ownership interest in the property, and Monty Kjos, a tenant of the building, was the property manager. In 1995, Anda became the property's sole owner.

*Fuel–Oil Use*

The building on Anda's property was designed to primarily use natural gas as its heating fuel, but it had a dual-heating or off-peak system. This system enabled the furnace to burn either natural gas or fuel oil. Fuel oil was stored in a 560–gallon underground storage tank buried under the parking lot, directly below the building. Though the storage tank was not visible, there were some visible signs of its existence. Copper tubing ran from the storage tank to the furnace. The furnace had a large toggle switch that could be used to control the furnace's fuel source. Approximately six feet of a one-and-one-half inch thick storage-tank-vent pipe ran along the outside of the first-floor mechanical room. And the storage tank's fill pipe cap was six inches in diameter and was visible until it was paved over sometime in the 1980s.

Mattson Oil Company delivered fuel oil to the storage tank for at least eight years, apparently from 1964 until 1972 or 1973. A Mattson Oil employee testified that during that time, the storage tank was on a "keep full" status, which meant that Mattson Oil refilled the tank every two weeks regardless of whether the tank was completely empty. The Mattson Oil employee testified that in 1972 or 1973 he emptied the tank, leaving two gallons of fuel oil in the bottom that he was unable to remove. The employee also testified that he had experience with emptying leaking tanks and stated that the tank was not leaking. He based his opinion on three observations: (1) there was no water in the tank; (2) the drained fuel oil looked fine; and (3)

Mattson Oil was able to use the drained fuel oil in its own heating system.

Kjos, Holiday Office Park's former property manager, testified at trial that he was aware of the storage tank and understood how the dual-heating system worked. Kjos also testified that before Anda acquired an interest in the property, a former owner gave Anda and Kjos a tour of the property and informed them of the dual-heating system. At trial Kjos explained that he was not sure fuel oil was ever used at the building, stating that when he became property manager in 1972 electrical tape held the furnace toggle switch in place in the natural gas position. Kjos also testified that he did not remove the tape or ever use fuel oil to heat the building. Kjos stated that he discontinued the fuel-oil order with Mattson Oil, but said that he could not remember whether he discussed the decision to do so with Anda.

Anda testified that he had no knowledge of the storage tank or dual-heating system until "recently" and he never used fuel oil during his ownership of the building. He explained he saw only natural gas bills for the property. But, Anda testified that he recalled Kjos telling him after the condemnation hearing that Kjos bought fuel oil, just not a whole lot.

*Moorhead Holiday Associates and the Redevelopment of Anda's Property*

Moorhead Holiday Associates (MHA) is a partnership that was formed in 2000 to redevelop land in Moorhead. Specifically, MHA hoped to redevelop a 24–acre commercial tract of property north of Interstate Highway No. 94 and east of Eighth Street into a retail center and a Marriott Hotel. The tract was comprised of over 20 separate properties, some of which were vacant or rundown. The tract included a property with a vacant Regency Inn, known as Parcel I; a property with a

Fryn' Pan Restaurant, known as Parcel II; and Anda's property.

Other entities collaborated with MHA to carry out the redevelopment project. MEDA entered into a Development Assistance Agreement with MHA, promising to provide tax-increment financing and other funding for the project. MHA and Hegg Companies, a franchise developer for Marriott Hotels, signed a Developer Agreement and Real Estate Contract to facilitate the construction of a Marriott Hotel. In the contract, MHA agreed that by August 14, 2001, it would convey to Hegg Companies eight acres of the property in the redevelopment tract, including Anda's property and parts of Parcels I and II. MHA also promised to "[p]rovide a 'clean' Site, free of all improvements, with all environmental problems addressed, abated and cleared." In its effort to meet this obligation, MHA employed Legend Technical Services to conduct a Phase I Environmental Site Assessment (ESA) investigation of the redevelopment tract.

MHA was able to purchase many of the properties in the redevelopment tract but was unable come to an agreement with Anda to purchase his property. As a result of this impasse, Legend Technical Services was unable to conduct its desired Phase I ESA or, indeed, any environmental investigation of Anda's property. The impasse also led to MEDA's decision to use its eminent domain power to take Anda's property.

### MEDA Condemns Anda's Property

In March 2001, MEDA commenced a quick-take eminent domain action to acquire Anda's property, as authorized by Minn.Stat. § 117.042 (2008). A quick-take proceeding allows a condemning authority to take title to and possession of property more quickly than it would in a standard eminent domain proceeding. See id. In a standard eminent domain proceeding, court-appointed commissioners meet, hold a hearing, and make an award of damages before the condemnor takes title to and possession of the property. See Minn.Stat. § 117.085 (2008); 25 James R. Dorsey, Bradley J. Gunn & Marc D. Simpson, Minnesota Practice—Real Estate Law § 10:14 (2008–2009 ed.). Because the standard eminent domain procedure can be lengthy, Minnesota's quick-take statute enables a condemning authority to take title to and possession of the owner's property before the commissioners file their award. Minn.Stat. § 117.042. The procedure can be utilized when the condemnor "require[s] title and possession of all or part of the owner's property prior to the filing of an award by the court appointed commissioners." See id. Under a quick-take proceeding, a district court may transfer title to and possession of property to the condemnor after the condemning authority has given the property owner at least a 90-day notice of its intention to take early title and possession and has paid to the owner or deposited with the court an amount equal to the condemnor's approved appraisal of the property's value. See id. Under the quick-take procedure, the court-appointed commissioners file their award after the transfer of title to and possession of the property. Even though title to and possession of the property have already been transferred, the property owner still retains the right to appeal the commissioners' award after it has been filed. See Minn.Stat. §§ 117.085.

MEDA deposited $500,000—the approved appraised value of Anda's property—with the district court when it commenced the quick-take proceeding. In an order dated June 29, 2001, the court granted MEDA's condemnation petition and approved the quick-take. The court also transferred legal title to Anda's property "in fee simple absolute" to MEDA as of the date of the order. But the court did not award MEDA possession of the prop-

erty until on and after 9:00 a.m. on July 2, 2001. Finally, the court appointed three individuals to serve as commissioners in accordance with Minn.Stat. § 117.075 (2008). On August 9, MEDA transferred title to and possession of the property to MHA.

### Discovery of Fuel–Oil Contamination

Once MEDA had possession of Anda's property, MHA was free to inspect it. This inspection led to the discovery of the fuel-oil storage-tank vent pipe, which led to an effort to locate any storage tanks that might be buried on the property. MHA proceeded to demolish the building and excavate soil in order to locate any tanks. Sometime around August 7, MHA discovered the fuel-oil storage tank and some contaminated soil. MHA hired Liesch Associates, an environmental consulting firm, to remove the storage tank. When unearthed, the tank was found to be in poor condition. Only the top half of the tank remained; the bottom half was gone and the centerline was corroded. One witness testified that what remained of the tank was "very brittle" and looked like "swiss cheese." The space that once held the tank was filled with water. One witness testified that "petroleum product" coated the water, creating a sheen. Additionally, the soil where the tank used to be was stained, and persons on site reported detecting a fuel-oil odor.

The soil contamination was most highly concentrated at the storage tank site, but the contamination extended beyond the perimeter of Anda's property and onto Parcels I and II. Liesch Associates determined that a release of more than 1,000 gallons of fuel oil from the storage tank had caused the contamination. Liesch concluded that corrosion caused the storage tank to leak and that a majority of the corrosion probably occurred after 1972, which meant the corrosion had accrued during Anda's ownership of the property.

Liesch also determined that the fuel-oil release had occurred over a period of time but that the "largest single leakage event would have been associated with the last fill event of the tank."

### Remediation of Contaminated Property

MHA voluntarily informed the Minnesota Pollution Control Agency (MPCA) of the contamination and submitted a development response action plan to the MPCA. It is undisputed that at the time, the MPCA did not order MHA to clean up the site. Nonetheless, MHA began excavating and removing all contaminated soil, working quickly to clean up the contamination so that it could tender a "clean site" to Hegg Companies by August 14 as required by the Developer Agreement and Real Estate Contract. MHA hired Mark II, the only bidder on the project, to remove and transport the contaminated soil approximately 100 miles to a treatment facility in Fosston, Minnesota. Mark II also refilled the excavation site with uncontaminated soil so the property was a "clean site" that was ready for construction. In total, 10,751 cubic yards of soil were removed from the site, 70 percent of which was removed from Anda's property.

MHA contracted to pay Mark II for each cubic yard of soil that Mark II "processed"—that is, excavated, hauled away, and "farmed." A dispute arose between MHA and Mark II regarding whether the cubic-yard measurement was to be based on "in-place" cubic yards—the soil as found onsite in the ground—or "haul amount" cubic yards—the soil as transported after excavation. The "haul amount" was 40 to 50 percent more in volume than the "in-place amount" due to the fact that "in-place" soil is much more compacted before excavation. MHA and Mark II arbitrated this dispute and the arbitrator ruled that the contract price would be based on the larger "haul

amount." MHA had already paid Mark II $684,579 for its work based on the amount of "in-place" cubic yards, so MHA then paid Mark II an additional $687,775 as a result of the arbitration award. MHA also incurred other cleanup costs. The total cost of remediation amounted to $1,599,568.[2]

MHA secured a $600,000 grant from the Minnesota Department of Trade and Economic Development to reimburse it for its cleanup costs.[3] But, MHA did not apply for reimbursement from the "Petrofund," which is controlled by the Petroleum Tank Release Compensation Board. *See* Petroleum Tank Release Cleanup Act, Minn. Stat. §§ 115C.01–.13 (2008). Under the Petroleum Tank Release Cleanup Act, the Compensation Board will generally refund up to 90 percent and in certain cases more than 90 percent of corrective action costs incurred in remediating a petroleum spill. Minn.Stat. § 115C.09, subd. 3(a). Petrofund reimbursement is limited to $1 million for a single release scenario. *Id.*

*Commissioners' Award*

On March 10, 2003, nearly two years after the condemnation action was commenced, the court-appointed commissioners awarded Anda $488,750 as compensation for his property. Both Anda and MEDA appealed the commissioners' award, and on June 9, 2003, the district court ordered the payment of $366,562.50 to Anda, an amount equal to three-fourths of the commissioners' award, pursuant to Minn.Stat. § 117.155 (2008).

*Tort Action*

MEDA ultimately reimbursed MHA for the remaining cleanup costs and MHA assigned any liability claims for the contamination of Parcels I and II to MEDA. On February 21, 2006, MEDA commenced a separate tort action for damages against Anda, alleging that Anda was liable for the cleanup costs associated with the contamination found on Parcels I and II. MEDA and Anda agreed to consolidate the contamination liability action with the condemnation action, and Anda did not challenge the admissibility of contamination evidence or remediation costs. Anda made a pretrial motion for summary judgment but the district court dismissed the motion as premature. Subsequently, Anda renewed his summary judgment motion and the court also denied this second motion.

*Consolidated Trial*

A consolidated trial of the condemnation and tort claims was held in early 2007. During the consolidated trial, Anda requested that he be permitted to present the defense of contributory negligence but the district court denied the request, stating that neither MEDA's nor MHA's conduct constituted a breach of any duty to Anda.

At the close of trial, the jury submitted two special verdict forms. On the first form, the district court asked the jury to determine two separate values of Anda's property—the value of the property "had it not been impaired by fuel oil contamination" and the value of the property "taking into account the fuel oil contamination." The court instructed the jury to use as the valuation date June 29, 2001, the day the court issued its condemnation order and ordered legal title to be transferred to MEDA. The jury found that (1) the value of the property "had it not been impaired by fuel oil contamination" was $455,000

---

2. The costs of cleaning up the separate parcels were $1,124,496 for the Anda property; $454,277 for Parcel I; and $20,235 for Parcel II.

3. MHA had already used a $3 million "hazardous substance sub district bond" from the City of Moorhead to address environmental contamination found on other parcels of the redevelopment tract.

and (2) that the value of the property "taking into account the fuel oil contamination" was $0.

On the second verdict form, the jury found that Anda, or his agents or partners, kept fuel oil in the storage tank during the time Anda was an owner of the property and that fuel oil from the storage tank escaped onto Parcels I and II. In addition, the jury found that Anda was negligent in the maintenance of the storage tank, and that this negligence was a direct cause of the contamination of Parcels I and II. In answering three other questions, the jury found that Anda had created a nuisance that, he negligently interfered with MEDA's use of Parcels I and II, and that this interference was the direct cause of MEDA's damages. Finally, the jury found that as a result of the contamination, MEDA incurred $454,277 in damages from the contamination of Parcel I, and $20,235 in damages from the contamination of Parcel II.

■ After receiving the jury verdict, the district court concluded that Anda was not entitled to receive any damages for the taking of his property. The court reached this conclusion because "the cost of remediation of the environmental contamination of the subject property exceeded what would otherwise have been its fair market value, and its fair market value was $0.00 as of the date of the taking." The court then entered a judgment of $366,562.50 plus interest against Anda, an amount that refunded MEDA's partial payment to Anda of three-fourths of the commissioners' award. The court also concluded Anda was liable in the amount of $474,512

for the cost of cleaning up the contamination on Parcels I and II because of "negligence, private nuisance, and strict liability under the doctrine of *Fletcher v. Rylands.*" [4] After trial Anda moved for a new trial and judgment as a matter of law, and the court denied the motions.

*Court of Appeals' Decision*

Anda appealed, and the court of appeals denied relief. *Moorhead Econ. Dev. Auth. v. Anda,* Nos. A07–1918, A07–1930, 2008 WL 4705663, at *1 (Minn.App. Oct. 28, 2008). In its opinion, the court of appeals suggested that Anda's property should have been valued as of March 10, 2003—the date of the commissioners' award—but ultimately held that the district court did not abuse its discretion in asking the jury to determine the value of Anda's property as of June 29, 2001 "taking into account the [fuel oil] contamination." *Id.* The court of appeals explained that "the existence of contamination on the property on the date of condemnation legitimately bears on the market value." *Id.* Regarding Anda's liability for the contamination of Parcels I and II, the court concluded that Anda failed to "challenge[ ] the jury's finding that he is liable for damages based on nuisance." *Id.* at *2. Because the jury's nuisance finding provided a basis for Anda's liability, the court did not address strict liability, negligence, or Anda's assertion that the district court should have submitted a comparative negligence instruction to the jury. *Id.* Finally, the court of appeals concluded that the district court did not abuse its discretion when it refused to grant Anda's motion for a new trial. *Id.* at *3. Anda petitioned our court

4. *Rylands v. Fletcher,* 1 L.R. Exch. 265 (1866), a 19th century English case, established a doctrine holding property owners strictly liable for damages caused by certain articles kept on their land. The nuisance strict liability doctrine as stated by our court is: "a party who, for his own profit, keeps on his premises anything not naturally belonging there, the natural tendency of which is to become a nuisance, and to do mischief if it escapes, is liable if it escapes, without proof of negligence, for all damages directly resulting therefrom." *Wiltse v. City of Red Wing,* 99 Minn. 255, 260, 109 N.W. 114, 115 (1906).

for review, challenging the condemnation award, the finding of liability for contamination of Parcels I and II, and the conclusion that he received a fair trial.[5]

### I.

The first question that Anda asks us to address on appeal is whether the district court erred when it concluded that Anda is not entitled to any damages for the taking of his property on the grounds that the cost of remediating his property exceeded the property's fair market value. For us to answer this question there are three preliminary issues that must be addressed because of certain facts in this case. These facts include the existence of fuel-oil contamination, the late discovery of the contamination, and the use of quick-take procedures. The preliminary questions to be answered are (1) the proper date of valuation in a quick-take proceeding, (2) what evidence, if any, of contamination is admissible in a condemnation proceeding, and (3) whether a condition, such as contamination, that exists on the date of the taking but is not discovered until after the taking can be considered in valuing the taken property.

Anda argues that the date the district court issued the quick-take condemnation order, June 29, 2001, is the proper date of valuation, and asserts that because no contamination had been discovered as of that date, his property should have been valued as uncontaminated. Anda also argues that for due process reasons, evidence of environmental contamination should not be admissible in an eminent domain proceeding.

MEDA argues that the date the commissioners' award is filed—here, March 10, 2003—is the date on which a property's value is assessed, and that all evidence relevant to valuation discovered before the filing of the award, including evidence of contamination, must be taken into account for valuation purposes. MEDA also asserts that any condition of the property that existed at the time of the transfer of title to and possession of the property to a condemnor should be considered, regardless of whether the condition was known at the time title to and possession of property was transferred. Under MEDA's theory, Anda's property should be valued as contaminated because the contamination existed on the date MEDA took possession of the property and was discovered before the commissioners filed their award.

*Valuation Date in a Quick–Take Eminent Domain Proceeding*

We first address the question of the proper date on which to value Anda's property. The alternatives for the date of valuation as we see them are (1) June 29, 2001, the date of the quick-take condemnation order; (2) July 2, 2001, the date the district court gave MEDA possession of Anda's property; or (3) March 10, 2003, the date of the court-appointed commissioners' award. The district court valued Anda's property on June 29, 2001. The court of appeals, following one of its cases, suggested that the proper valuation date is the date of the commissioners' award. *See Moorhead*, 2008 WL 4705663, at *1 (citing *City of Chisago v. Holt*, 360 N.W.2d 390, 393 (Minn.App.1985)).[6]

---

**5.** On appeal to our court, Howard A. Roston and Bradley J. Gunn filed a request for leave to participate and file a brief of Amicus Curiae. Moorhead Economic Development Authority made a motion to deny this request and strike the brief of Amicus Curiae Roston and Gunn. On May 7, 2009, we issued an Order deferring consideration of Moorhead Economic Development Authority's motion

until consideration of this appeal on its merits. Having considered Moorhead Economic Development Authority's motion on the merits, we hereby grant its motion and strike the brief of Amici Curiae.

**6.** In *Holt*, the court of appeals affirmed a district court's decision to value property taken by quick-take procedures as of the date of

In support of its argument that the value of Anda's property should be assessed as of March 10, 2003, MEDA cites several of our decisions that state that the proper date of valuation is the date of the court-appointed commissioners' award. *E.g., City of St. Louis Park v. Almor Co.*, 313 N.W.2d 606, 610 (Minn.1981). While the cases cited by MEDA may be informative, we conclude that they do not necessarily support MEDA's position. One of the cases MEDA cites in support of its argument is *State by Lord v. Pahl*, a case in which we were asked to determine the appropriate date of valuation in an eminent domain proceeding. 257 Minn. 177, 182, 100 N.W.2d 724, 728 (1960). In *Pahl*, we did not state, as MEDA implies, that the date of valuation is always the date of the commissioners' award. Rather, we stated that condemned property should be valued as of the "date of the taking" and explained that the date of the taking is "generally" the date the commissioners file their award. *Id.* at 182, 100 N.W.2d at 728. More specifically, we said, "Ordinarily such value is determined as of the date of the taking rather than as of the date of the institution of the condemnation proceedings; and the former is *generally* held to be that upon which the commissioners appointed by the court file their award of damages in the proceedings." *Id.* at 182, 100 N.W.2d at 728 (emphasis added).

■ Many of our cases, like *Pahl*, suggest the date of the commissioners' award is the valuation date. But in *Pahl*, as well as the other cases cited by MEDA, the condemning authority did not have quick-take procedures available to it or did not avail itself of those procedures. The consistent rule we have articulated in most of these cases is that "compensation shall be determined as of the time of the taking."

the commissioners' award. 360 N.W.2d at 393. To the extent that our opinion conflicts

*See, e.g., Housing & Redev. Auth. of St. Paul v. Greenman*, 255 Minn. 396, 410, 96 N.W.2d 673, 683 (1959). In *Greenman*, we explained that the operative concept for the date of valuation of condemned property is "that time when by the terms of the statute the owner is divested of his title and it vests in the condemning party." *See id.* at 410, 96 N.W.2d at 683. Thus, we conclude our analysis should focus on when the "time of the taking" occurs in a quick-take proceeding.

■ The procedural differences between a standard eminent domain proceeding and a quick-take proceeding indicates that the "time of the taking" in these different proceedings occurs at a distinctly different point in time. In a standard proceeding, the condemning authority "has the right to the title and possession after the filing of the award by the court appointed commissioners" when the condemning authority has either paid the award, or—if there is an appeal of the award—has paid a portion of the award to the party or to the court. Minn.Stat. § 117.042. In a standard eminent domain proceeding, it makes sense that the filing of the commissioners' award is the date of valuation, i.e., the date of the taking, because the filing of the award is the triggering event for the payment of all or part of the award and for the transfer of title to and possession of the condemned property. According to the procedures dictated by the statute, the court-appointed commissioners must value the property and file their award before the court can transfer title and possession to the condemnor. *Id.*

In a quick-take proceeding, transfer of title to and possession of the property occurs at a different point in time. Under the terms of Minn.Stat. § 117.042, a prop-

with the opinion in *Holt, Holt* is overruled.

erty owner subject to a quick-take is divested of his title "prior to the filing of an award by the court appointed commissioners." In a quick-take proceeding, after the condemnor has given the property owner "at least 90 days" notice of its "intent to possess" the property and has paid or deposited with the district court "an amount equal to [its] approved appraisal of value," the court may order the transfer of title and possession. *Id.* Thus, the "time of the taking" in a quick-take proceeding occurs *before* the filing of the court-appointed commissioners' award. As a result, using the date of the commissioners' award for valuation purposes in a quick-take proceeding is inconsistent with our prior case law, which focuses on the date of the taking. In a quick-take proceeding, the transfer of title and possession—the date of the taking—occurs well before the commissioners file their award.[7] Therefore, we hold that in a quick-take proceeding, the date of valuation is the date when title and possession[8] of the condemned property are transferred from the owner to the condemning authority.

*Application of Valuation Rule to the Facts of this Case*

■ Our holding that the date of valuation in a quick-take proceeding is when title and possession of the condemned property are transferred from the owner to the condemning authority does not completely resolve the date of valuation question in light of the specific facts of this case. The district court's order set out one date for the transfer of title to Anda's property and another date for the transfer of possession of Anda's property. In its order, the court transferred title to Anda's property to MEDA as of the date of the order—June 29, 2001—and ordered MEDA to take possession of Anda's property three days later, at 9:00 a.m. on July 2, 2001.

■ The answer as to what date should be used for valuation of Anda's property can be found both in our case law and the language of the quick-take statute. As previously indicated, our case law instructs that the "time of the taking" is when title to and possession of property transfers to the condemning authority. *See, e.g., Pahl,* 257 Minn. at 182, 100 N.W.2d at 728. The quick-take statute refers to a district court order "transferring title and possession of the property." *See* Minn.Stat. § 117.042. The statute does not separate the two events but rather joins them. We therefore conclude the language of the statute means both title and possession must be transferred in order to establish the valuation date. Here, title transferred on June 29, but the transfer of possession did not occur until July 2 at 9:00 a.m. It was not until July 2 that MEDA had both title to and possession of Anda's property. Accordingly, we hold that the proper date of valuation for Anda's property is July 2, 2001, the date that MEDA had both title to and possession of Anda's property.

---

7. Minnesota Statutes § 117.195 (2008) provides further support for the assertion that the date of the quick-take is not the date of the commissioners' award. It states, "[a]ll damages ... shall bear interest from the time of the filing of the commissioner's report or from the date of the petitioner's possession whichever occurs first." *Id.* If property was valued as of the commissioners' award in a quick-take, the government would pay interest as of the date it took the property but pay an award based on the value of the property when the commissioners complete their report, months or perhaps years later.

8. We use the transfer of both title and possession rather than solely the divestment of title concept quoted from *Greenman,* 255 Minn. at 410, 96 N.W.2d at 683, because Minn.Stat. § 117.042 is written in terms of "transferring title *and* possession of the property." (Emphasis added.) We conclude that the word "and" is conjunctive.

## II.

■ Having established that Anda's property should be valued as of July 2, 2001, we next address the issue of how to treat evidence of environmental contamination—particularly evidence of the costs of remediation—when valuing property that is being condemned. The condemnation action was consolidated with the contamination liability action, and evidence of contamination of Anda's property as well as Parcels I and II was admitted at the consolidated trial. MEDA asserts that Anda waived the issue of the admissibility of contamination. We disagree. We acknowledge that Anda did not challenge the admissibility of contamination and remediation-cost evidence at the consolidated trial, but note that Anda repeatedly argued to the lower courts that the contamination evidence should not be considered in determining his condemnation award. Further, even if Anda did not precisely frame the issue below as he has presented it here, we conclude that the interests of justice and the unique circumstances of this case justify our review of the issue.

■ We have frequently recognized our authority to take any action "as the interest of justice may require." Minn. R. Civ. App. P. 103.04. This includes considering issues not raised by the parties below, or if raised, not articulated in precisely the manner necessary to clearly present the issues for appellate review. We have often stated that an appellate court has a "responsibility to review the record even though the assignments of error are inadequate." *State v. Peterson,* 266 Minn. 77, 83, 123 N.W.2d 177, 182 (1963) (citations omitted) (internal quotation marks omitted). In *State v. Hannuksela,* we stated that "it is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities." 452 N.W.2d 668, 673 n. 7 (Minn.1990) (citations omitted) (internal quotation marks omitted).

We have exercised our authority to take any action "as the interest of justice may require" in the civil context as well as in criminal cases. *See Putz v. Putz,* 645 N.W.2d 343, 350 (Minn.2002) (concluding that justice required consideration of an issue not raised below); *see also Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 403 (Minn.2000) (noting that the requirement that issues be raised in the lower courts is not an "ironclad rule"). Here, we not only conclude that Anda sufficiently preserved the issue of admissibility of contamination evidence, but that the interests of justice and the unique circumstances of this case justify our review of this issue. Therefore, we will consider this issue of admissibility of contamination evidence on the merits.

*Eminent Domain Power and Just Compensation*

The issue of how to treat evidence of environmental contamination when valuing property that is being condemned is an issue of first impression in Minnesota. In addressing the question of whether and to what extent environmental contamination is admissible in condemnation proceedings, we will conduct an analysis of the history of the eminent domain power, existing Minnesota law, and the law in other jurisdictions in our effort to articulate a rule of law that is applicable to this case.

■ A state's ability to use eminent domain to take an individual's property is an awesome power. Eminent domain is the inherent power of a sovereign to take an individual's private property without the individual's consent. *See State by Burnquist v. Flach,* 213 Minn. 353, 356, 6 N.W.2d 805, 807 (1942); *see generally* 1 *Nichols on Eminent Domain* § 1.11, at 1–7 (Julius L. Sackman & Russell D. Van Brunt eds., 3d ed.2002). In *Flach,* we

said: "Eminent domain is an inherent and essential attribute or prerogative of sovereignty. It is not conferred by the constitution." 213 Minn. at 356, 6 N.W.2d at 807. (Citation omitted) (Internal quotation omitted).

■ Both the United States and Minnesota Constitutions limit this sovereign power, requiring a public purpose and a payment of just compensation to the property owner for each taking. *See* U.S. Const. amend. V; Minn. Const. art. I, § 13; *see also Flach*, 213 Minn. at 356, 6 N.W.2d at 807. The Fifth Amendment to the United States Constitution provides that "nor shall private property be taken for public use, without just compensation," and article I, section 13 of the Minnesota Constitution states: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefore, first paid or secured." When construing this language we have said that "[t]he right of compensation thus granted is absolute, precedent to the constitution itself, inherent without recognition therein; and no attempt to deprive the citizen of this incontestable right could be tolerated in any system of free government." *State ex rel. Ryan v. Dist. Court of Ramsey Cnty.*, 87 Minn. 146, 151, 91 N.W. 300, 302 (1902). Without identifying to which constitution we referred, we have observed that because a constitutional provision for just compensation was "inserted for the protection of the citizen, it ought to have a liberal interpretation, so as to effect its general purpose." *Adams v. Chicago, Burlington & N. R.R.*, 39 Minn. 286, 290, 39 N.W. 629, 631 (1888).

■ Case law instructs us to be vigilant in enforcing the just compensation requirement. The United States Supreme Court has stated that the just compensation provision of the United States Constitution requires that when the government condemns property, it must put a property owner "in as good a position pecuniarily as if his property had not been taken." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). We have said that a condemning authority must give the property owner a " 'full and exact equivalent' " for the property taken. *Minneapolis–St. Paul Sanitary Dist. v. Fitzpatrick*, 201 Minn. 442, 449, 277 N.W. 394, 398 (1937) (quoting *Olson*, 292 U.S. at 254, 54 S.Ct. 704). This "equivalent" is usually " 'the market value of the property at the time of the taking contemporaneously paid in money.' " *Id.* (quoting *Olson*, 292 U.S. at 254, 54 S.Ct. 704). When determining value, neither the property owner's use of the property nor the condemnor's planned use is dispositive; instead, suitable uses, including the "highest and most profitable use for which the property is adaptable and needed" must be considered. *See Olson*, 292 U.S. at 255, 54 S.Ct. 704.

Under Minnesota law, a panel of court-appointed commissioners determines just compensation when the government takes private property and it is this panel that ascertains and reports the amount of damages that will be sustained by the property owner on account of the taking. *See* Minn. Stat. § 117.075, subd. 2. If either the property owner or the government is dissatisfied with the commissioners' award, the dissatisfied party may appeal to the district court. Minn.Stat. § 117.145. The district court or jury hearing the case must then reassess the damages de novo. Minn.Stat. § 117.175 (2008).

In *State by Humphrey v. Strom*, we addressed the question as to what evidence is relevant and admissible in an eminent domain trial. 493 N.W.2d 554 (Minn.1992). We stated that "evidence will be admitted concerning any factor which would affect the price a purchaser willing but not required to buy the property would pay an owner willing but not required to sell it."

*Id.* at 559. We have also said, "Any competent evidence may be considered if it legitimately bears on the market value." *State v. Malecker,* 265 Minn. 1, 5, 120 N.W.2d 36, 38 (1963).

As previously noted, the specific question of whether evidence of environmental contamination or the cost of remediation is admissible in a condemnation proceeding is an issue of first impression in Minnesota. But other state courts have considered how contamination affects valuation in condemnation proceedings, and we find this case law instructive to our analysis. Our analysis of case law in other jurisdictions indicates that two primary but contrasting approaches—as well as minor variations of those approaches—have generally emerged.

*Two Primary Approaches: Inclusion or Exclusion*

In one approach, states have held that evidence of environmental contamination, including the cost of remediation, is admissible.[9] Essentially, courts that adhere to what we call the "inclusion approach"[10] assert that environmental contamination affects the fair market value of property and is therefore relevant to determining just compensation. *See, e.g., Ne. Conn. Econ. Alliance, Inc. v. ATC P'ship,* 256 Conn. 813, 776 A.2d 1068, 1079–80 (2001). These courts also conclude that the exclusion of contamination evidence would result in condemnation awards that are inaccurate and force the government to pay more for the condemned property than it is worth. *See, e.g., id.* at 1080. For example, the Connecticut Supreme Court has said, "[e]xcluding contamination evidence, as a matter of law, is likely to result in a fictional property value." *Id.*

Other states have followed a different approach, which we call the "exclusion approach."[11] These states have concluded that valuing condemned property as contaminated is unfair to the property owner as the value of the property is often reduced, dollar-for-dollar, by the cost of remediation. *See, e.g., Hous. Auth. of*

---

9. *See, e.g., Redev. Agency of Pomona v. Thrifty Oil Co.,* 4 Cal.App.4th 469, 5 Cal.Rptr.2d 687 (1992); *Ne. Conn. Econ. Alliance, Inc. v. ATC P'ship,* 256 Conn. 813, 776 A.2d 1068, 1080 (2001); *City of Olathe v. Stott,* 253 Kan. 687, 861 P.2d 1287 (1993); *Silver Creek Drain Dist. v. Extrusions Div., Inc.,* 468 Mich. 367, 663 N.W.2d 436 (2003); *Dep't of Transp. v. Hughes,* 162 Or.App. 414, 986 P.2d 700 (1999); *Tennessee v. Brandon,* 898 S.W.2d 224 (Tenn.Ct.App.1994). *Cf. Finkelstein v. Dep't of Transp.,* 656 So.2d 921, 922 (Fla. 1995) (holding contamination evidence is only admissible when there is "sufficient factual predicate" to conclude that the contamination will influence the fair market value of the property).

10. The concurrence/dissent refers to the inclusion approach as the "majority view" and supports its endorsement of the inclusion approach by noting that its position is consistent with the majority of courts across the nation on this issue. We find this offered support for the concurrence/dissent's position to be of minimal persuasive value. Only a handful of courts—approximately 11—have addressed the issue, and only a slim majority adheres to the inclusion approach as opposed to the exclusion approach. At best, seven of the eleven jurisdictions follow the inclusion approach. Out of those seven jurisdictions, two are more nuanced than the concurrence/dissent implies. More specifically, in *Thrifty Oil,* the court allowed the jury to deduct the costs of remediation from the award, but the defendant did not challenge the admissibility of remediation-cost evidence and the court did not address the question. *See* 5 Cal.Rptr.2d at 689. In *Finkelstein,* the court allowed evidence of contamination, including remediation-cost evidence, but only when certain conditions were met. 656 So.2d at 922.

11. *See Dep't of Transp. v. Parr,* 259 Ill.App.3d 602, 198 Ill.Dec. 557, 633 N.E.2d 19 (1994); *Aladdin, Inc. v. Black Hawk Cnty.,* 562 N.W.2d 608 (Iowa 1997); *Hous. Auth. of New Brunswick v. Suydam Investors, LLC,* 177 N.J. 2, 826 A.2d 673 (2003); *City of New York v. Mobil Oil Corp.,* 12 A.D.3d 77, 783 N.Y.S.2d 75 (N.Y.App.Div.2004).

*New Brunswick v. Suydam Investors, LLC,* 177 N.J. 2, 826 A.2d 673, 686 (2003). Some courts that follow the exclusion approach exclude all evidence of contamination. *See Dep't of Transp. v. Parr,* 259 Ill.App.3d 602, 198 Ill.Dec. 557, 633 N.E.2d 19 (1994); *Aladdin, Inc. v. Black Hawk Cnty.,* 562 N.W.2d 608 (Iowa 1997). Other courts have held more specifically that evidence of remediation costs is inadmissible, but property taken should be valued as remediated, as opposed to being clean, i.e., never contaminated. *See Suydam Investors,* 177 N.J. 2, 826 A.2d 673; *City of New York v. Mobil Oil Corp.,* 12 A.D.3d 77, 783 N.Y.S.2d 75 (N.Y.App.Div.2004).

▇ After having analyzed the two primary approaches utilized by other courts, we conclude that the exclusion approach with certain modifications is the better approach. While evidence of contamination and remediation may be admissible for the limited purposes later discussed, evidence of remediation costs should not be admissible in an eminent domain proceeding and property taken under the government's eminent domain power should be valued as remediated. We adopt this approach because we conclude that it does a better job of ensuring that property owners will be justly compensated and made whole when the power of eminent domain is used to take their property. This approach has the greatest likelihood of placing the property owner "in as good a position pecuniarily as if his property had not been taken," *see Olson,* 292 U.S. at 255, 54 S.Ct. 704, but will also provide a mechanism to prevent the condemning authority from paying more for the property than it is worth. Several reasons support our choice of a modified exclusion approach, including fairness and due process concerns.

*Fairness Considerations*

The primary criticism of the inclusion approach is that admitting evidence of remediation costs in a condemnation proceeding may subject an owner of contaminated property to "double liability" for that property, or to a "double-take." This double-take may occur under the inclusion approach because when the government condemns contaminated property, environmental liability laws and condemnation proceedings intersect in a way that unfairly punishes a property owner. *See Suydam Investors,* 826 A.2d at 686. Admitting evidence of contamination and remediation costs during the condemnation proceeding encourages a jury to value the property as contaminated, often times reducing the condemnation award dollar-for-dollar by the actual or estimated cost of remediation. *See Aladdin,* 562 N.W.2d at 614. At the same time, the property owner may be held liable for the contamination under environmental liability law. *Id.* at 615. The New Jersey Supreme Court described this risk of a double-liability in *Suydam Investors:*

> When property is devalued for contamination in condemnation, landowners first receive discounted compensation in the condemnation proceeding and then are subject to the full cleanup costs, thus suffering what is colloquially denominated as a "double-take." Under that scheme, the condemnor receives a windfall by ultimately obtaining the property in a remediated state at the condemnee's cost, yet paying a discounted price due to the contamination.

826 A.2d at 686. The exclusion approach, in contrast, acknowledges that environmental contamination of a condemned property necessarily involves environmental liability laws and avoids subjecting an owner of condemned property to double liability. If remediation costs are not ad-

missible in condemnation proceedings, the property owner will not be forced to surrender his property to a condemnor at a reduced price, thus avoiding any risk of double liability.

We conclude that the risk of double liability is very real under Minnesota law. Minnesota environmental laws assign liability to property owners for contamination. For example, under the Minnesota Environmental Response and Liability Act, any person responsible for the release of a hazardous substance is liable for cleanup costs as well as any resulting economic loss or personal injury. Minn.Stat. §§ 115B.04–.05 (2008). Under the Petroleum Tank Release Cleanup Act, the general rule is that any person who is an owner or operator of a petroleum tank any time during or after a petroleum release is a "responsible person" and may be liable for the cost of corrective actions—"actions taken to minimize, eliminate, or clean up a release." Minn.Stat. §§ 115C.02–.04 (2008).[12] While MEDA did not sue Anda for the contamination of his own property, MEDA or the MPCA could have sought to hold Anda responsible. Excluding evidence of remediation costs diminishes the risk that a property owner such as Anda will face double liability for contamination that existed on his property when it is taken.[13]

■ Critics of the exclusion approach opine that double liability should not be a concern because the only relevant question in an eminent domain proceeding is the fair market value of the property taken and an eminent domain proceeding should be entirely separate from any determination of liability for contamination. The Connecticut Supreme Court has stated:

> The condemnor is acquiring property in a given condition, and with a value based on that condition. How the property got to be that way and who is responsible has nothing to do with that determination. To deny the condemnor the right to put on evidence as to one of the significant determinants of that condition—and hence value—because it may not reflect the owner's degree of responsibility for the condition misses the point of an eminent domain valuation process. If a condemnor sought to acquire a property which had been damaged by the negligence of a third party (e.g., lateral support, landslides), the condemnor would not pay the undamaged value of the property because the condition was not the owner's fault.

*ATC P'ship*, 776 A.2d at 1083. While the Connecticut court makes a valid point, its analysis ignores the unfairness inherent in the inclusion approach—the unfairness of forcing a property owner to sustain a greater financial loss than he would have otherwise sustained solely because the condemnor uses its eminent domain power

---

**12.** Both the Minnesota Environmental Response and Liability Act and the Petroleum Tank Release Cleanup Act make exceptions for government entities that acquire land through their eminent domain power. The Department of Transportation is not responsible for a petroleum release solely as a result of the acquisition of property, Minn.Stat. § 115C.021, subd. 3a (2008), and the state, a state agency, or a political subdivision is not responsible for hazardous substance release solely as a result of the acquisition of property through condemnation, Minn.Stat. § 115B.03, subd. 5 (2008).

**13.** The concurrence/dissent notes that Anda has not yet been sued or otherwise held liable for cleanup costs associated with remediation of Anda's property and Anda has therefore been held liable for the contamination only once, in the form of a reduced condemnation award. This is true, but in determining what the law is going to be in Minnesota on this issue, we believe it more responsible and prudent for us to consider the risks inherent in the two approaches and select the approach that follows the constitution and provides just compensation to property owners.

to forcibly take that person's private property. Although condemnation awards are usually based on the fair market value of the property in whatever condition the property is at the time of the taking, the constitutional standard that courts must adhere to is "just compensation." Courts can be fluid in the standards they apply to determine "just compensation" when fairness so requires. *See United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950). In *Commodities Trading*, the Supreme Court held:

> [W]hen market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards.... Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is "just" both to an owner whose property is taken and to the public that must pay the bill?

*Id.* In instances of contaminated property, admitting remediation costs and valuing the property in its contaminated condition is not "just." Therefore, we conclude that the Connecticut court's approach and that of the concurrence/dissent veers too far from the constitutional limits on taking, which are meant to ensure just compensation.

Here, we note that the concurrence/dissent claims that we overturn our precedent. But we have never considered the admissibility of contamination evidence before. Moreover, while we acknowledge that any competent evidence that legitimately bears on the market value is usually admissible, it is also true that "just compensation" has always been our constitutional standard. *See* U.S. Const. amend. V; Minn. Const. art. I, § 13; *Malecker*, 265 Minn. at 5, 120 N.W.2d at 38. We believe that by adopting the exclusion approach, we are faithfully abiding by that constitutional standard and our precedent.[14]

We also conclude that the fair market value of contaminated property is often very "difficult to find" because of the unique nature of each piece of property and the type and extent of contamination to that piece of property. *See Commodities Trading Corp.*, 339 U.S. at 123, 70 S.Ct. 547. The New Jersey Supreme Court has explained that "finding a comparable parcel on which to base an estimate of value is problematic because all contamination is different." *Suydam Investors*, 826 A.2d at 686–87 (citing *Silver Creek Drain Dist. v. Extrusions Div., Inc.*, 245 Mich.App. 556, 630 N.W.2d 347, 354 (2001) ("Contaminated properties are like snowflakes; no two are alike.")). Similarly, the Iowa Supreme Court has observed that "traditional expert testimony as to fair market value based on comparable sales

---

**14.** Citing Minn.Stat. § 115B.13 (2008), the concurrence/dissent states that Minnesota law explicitly prohibits double recovery and that therefore, double liability is not a concern. By citing to Minn.Stat. § 115B.13, the concurrence/dissent misses the point. This statute provides that a person who recovers damages under the Minnesota Environmental Response and Liability Act, Minn.Stat. §§ 115B.01–20 (2008), "may not recover the same costs or damages pursuant to any other law." The statute does nothing to prevent the double liability problems that may arise under the inclusion approach for a property owner whose contaminated property is condemned. More specifically, the statute does not prohibit a condemning authority from recovering damages from a property owner through a environmental liability action after the property owner has been granted a condemnation award based on the value of the property as contaminated, i.e., an award reduced by remediation costs.

would be unavailable in most instances because of the difficulty in locating 'comparable' contaminated property sales." *Aladdin,* 562 N.W.2d at 616.[15] Because the fair market value of contaminated property is "difficult to find" and subjecting a property owner to double liability is a "manifest injustice," we believe that excluding remediation-cost evidence in condemnation proceedings is appropriate. *See Commodities Trading,* 339 U.S. at 123, 70 S.Ct. 547.

We recognize that the exclusion approach also raises some fairness concerns. As proponents of the inclusion approach and the concurrence/dissent asserts, there is a possibility under the exclusion approach that a condemning authority will pay more than it should for contaminated property if court-appointed commissioners or fact-finders do not consider remediation costs. But a condemning authority will often have the opportunity to rectify any such fairness issue by filing a separate action against the party responsible for the contamination—whether it be the current owner or some other person, entity, or owner—under an appropriate environmental liability statute to compel that party to remediate the property or pay damages. Alternatively, in instances of petroleum releases, the condemning authority may be able to recover cleanup costs directly from other sources or funds, i.e., the Petrofund. *See* Minn.Stat. § 115C.09, subds. 3a, 3b.[16] Even though the exclusion approach raises some fairness concerns, these concerns are more easily avoided or resolved under this approach than it would be to avoid or resolve the fairness concerns raised by the inclusion approach. Consequently, we conclude the possibility under the inclusion approach of holding a property owner doubly liable for contaminated property is too great and too difficult to remedy for that approach to be viable when the risk of unfairness present in the exclusion approach can be avoided.

As we have pointed out, a condemning authority can file a separate liability action against a responsible property owner to recover remediation costs, thereby avoiding the unfairness of paying for the value of the remediated property but also paying for the remediation process once it has taken the property. Other courts have identified a legitimate concern that a property owner may take its condemnation award and then "disappear or dissolve leaving the condemnor without a cleanup remedy." *See, e.g., Suydam Investors,* 826 A.2d at 688. To address this concern, the New Jersey Supreme Court adopted a "trust escrow" modification of the exclu-

---

15. There is another reason to decline to use the pure fair-market-value standard as the valuation method for contaminated property. In *Aladdin,* the Iowa Supreme Court noted that admission of remediation costs at condemnation proceedings "would require the parties to employ environmental experts qualified to testify as to the nature of the contamination, its concentration, and the methods and cost of cleanup. This would force the property owner to incur significant cost to counter the condemnor's expert testimony, which is provided by public funds." 562 N.W.2d at 616. We agree with the Iowa Supreme Court that it is unfair to require a property owner to incur such significant costs in securing just compensation for his property.

16. The concurrence/dissent asserts that "fairness requires" that contamination liability "not be determined in the condemnation proceeding." We agree; one of the reasons we have adopted the exclusion approach is that it best ensures that liability determinations and condemnation proceedings remain separate. Contrary to the concurrence/dissent's concern, using the exclusion approach, *prevents* the liability issue from being determined in the condemnation proceeding. Under the exclusion approach, the condemning authority cannot hold the property owner "liable" for contamination through a reduced condemnation award. Instead, that authority must prove liability against a responsible party in a separate proceeding.

sion approach, *see id.* at 687–88, and soon after a New York court followed New Jersey's lead, *see Mobil Oil Corp.,* 12 A.D.3d at 77, 783 N.Y.S.2d 75. In New Jersey and New York, property is valued as remediated, and then:

> The full award of just compensation is not paid directly to the owner. Rather, ... a portion of the award sufficient to cover cleanup costs is escrowed or held in trust until the exact amount of cleanup costs has been determined. Once response costs are determined, a corresponding amount representing the owner's liability is then disbursed from the trust or escrow account. Only the surplus, if any, is paid to the owner.

*Suydam Investors,* 826 A.2d at 689–90 (citing 7A *Nichols on Eminent Domain* § 13B.03(4), at 13B–68 (Patrick J. Rohan & Melvin A. Reskin, eds., 3d ed.2002)). At this time, we decline to require placing portions of condemnation awards in a trust or escrow account.

### Due Process Concerns

We also conclude that procedural due process concerns under both the United States and Minnesota Constitutions support our adoption of our modified exclusion approach. An eminent domain action does not have the same procedural safeguards as an environmental-contamination action, including the opportunity for the property owner to contest liability for the contamination, bring third-party actions against former owners, assert certain defenses, or recover from any insurance coverage. Allowing a condemning authority to recoup environmental remediation costs through a reduced award permits the condemnor "to circumvent the procedures established by the legislature and the Environmental Protection Agency for recovering environmental remediation costs." *Parr,* 198 Ill.Dec. 557, 633 N.E.2d at 22. Even though Anda was not held liable for the contamination found on his property through an environ-mental action, he was forced to pay for the contamination through a reduced condemnation award. In a condemnation proceeding, a property owner is not able to implead other potentially responsible parties or assert defenses as he would in an environmental liability action. In addition, how the property came to be contaminated and who may be responsible is not relevant in a condemnation proceeding. For these reasons, we conclude that a rule of law excluding cost-of-remediation evidence more adequately protects a property owner's procedural due process rights.

■ The concurrence/dissent makes two additional arguments in opposition to our adoption of the exclusion approach. First, it asserts that contamination evidence is admissible in tax court proceedings and second, that Minn.Stat. § 117.085 requires commissioners to make a finding regarding the estimated costs of remediation upon a party's request. With respect to the first argument, the concurrence/dissent asserts that because contamination evidence "is admissible in a tax court proceeding, it ought to be admissible in a condemnation proceeding." But in a tax court proceeding, the admission of contamination evidence does not raise the same constitutional concerns of due process and just compensation that it does in a condemnation proceeding.

As to the second argument, the concurrence/dissent asserts that Minn.Stat. § 117.085 provides that contamination evidence is admissible in condemnation proceedings. We conclude this assertion lacks merit because section 117.085 does not expressly provide that contamination evidence be admitted or that contaminated property be valued as contaminated, and if we were to read the statute so the statute would run afoul of the constitutional principles of due process and just compensation.

### Valued as Remediated

■ While we conclude that evidence of remediation costs is not admissible in a condemnation proceeding, we also conclude that the property taken should be valued "as remediated" rather than "as clean." In other words, in instances of condemnation of contaminated property, just compensation will usually be the fair market value of the property as remediated. Clean property is property that has never been contaminated. Remediated property is property that was contaminated but went through a remediation process to remove the contamination. Though the contamination is removed, the stigma of the former contamination may remain. In *Finkelstein,* the Florida Supreme Court defined stigma as a "reduction in value caused by contamination resulting from the increased risk associated with the contaminated property" and observed "many prospective buyers are afraid of the financial risk associated with ... previously contaminated properties and would therefore pay less for the property." 656 So.2d at 924 (internal quotation marks omitted). Even if the contamination is cleaned up and a property is believed to have been fully remediated, fear of discovering further contamination and the accompanying liability may reduce the property's value. The effect of stigma demonstrates how remediated property, which is no longer contaminated, is different from property that has never been contaminated.

The differences between environmental contamination and stigma persuade us to conclude that the cost of remediating contaminated property should not be considered in valuing contaminated property while the stigma that attaches to remediated property should be considered. Contamination is not an immutable condition, but stigma may well be. We agree with the New Jersey Supreme Court that "to the extent that contamination ... is sub-

ject to cure, it can fairly be argued that it is not an immutable condition of land and that its remediation is more like a transactional cost than a value concept." *See Suydam Investors,* 826 A.2d at 686. We conclude that stigma is more akin to an immutable condition that just compensation should reflect because it cannot be cured in the same way that contamination can be cured. In addition, a property owner cannot be held doubly liable for stigma, and a property owner does not have the same due process concerns with respect to a reduction in land value due to stigma.

■ Therefore, even though we conclude that evidence of remediation costs is inadmissible, we also conclude the proper valuation of condemned contaminated property is "as remediated" as opposed to "as contaminated" or "as clean." In instances of condemnation of contaminated properties, just compensation will likely be the fair market value of the property as remediated. We conclude that evidence of contamination of the property being taken can be admitted and considered, but only to the extent necessary to determine the value of the property "as remediated"— namely, if there is any loss of value to the property due to the stigma of the contamination.

### III.

■ We next address the question of how to treat evidence of environmental contamination of condemned property that is discovered after the date of the taking. It is undisputed that as of July 2, when MEDA took possession, the parties had not yet discovered the fuel-oil contamination. It is also undisputed that the contamination was not discovered until about one month later, on or about August 7, 2001. Therefore, we must determine whether conditions that exist at the time of

the taking but are subsequently discovered by the parties should be considered for valuation purposes.

We have said that in the situations where the value of property increases post-condemnation, a property owner "is not entitled to compensation for any element resulting subsequently to or because of the taking." *Fitzpatrick*, 201 Minn. at 450, 277 N.W. at 399. This language may appear to indicate that subsequently-discovered conditions should likewise not be considered for valuation purposes. But there is a distinction between an actual condition of the property that exists at the time of the taking that is *discovered* after the taking and a change in the condition of property that *occurs* after the taking. Contamination that exists at the time of the taking is not an "element [that] result[s] subsequently to or because of the taking." *See id.* Therefore, we conclude that a condition that exists on the property at the time of the taking may be relevant to determining just compensation, regardless of whether the parties were aware of the condition at the time of the taking.

■ Other courts have concluded that conditions that exist at the time of the taking but are discovered after the taking should be taken into account for valuation purposes, whether they positively or negatively affect the value of the property. *San Diego Cnty. Water Auth. v. Mireiter*, 18 Cal.App.4th 1808, 23 Cal.Rptr.2d 455,

459 (1993); *State by Comm'r of Transp. v. Shein*, 283 N.J.Super. 588, 662 A.2d 1020, 1022, 1026 (1995); *Dep't of Transp. v. Hughes*, 162 Or.App. 414, 986 P.2d 700, 704 (1999). The California Court of Appeals has said, "while evidence of a change in the condition of the property after the date of valuation may not be admissible, information about the condition of the property on the date of valuation which happens to be discovered after that date must be considered." *Mireiter*, 23 Cal. Rptr.2d at 459 (citation omitted); *see also Hughes*, 986 P.2d at 704. These other courts have concluded that fair market value of property is based on what a hypothetical but willing buyer would pay a hypothetical but willing seller, regardless of what the actual parties knew at the time of the taking. *See, e.g., Hughes*, 986 P.2d at 704. We agree. We conclude that when valuing condemned property, the fact finder should take into account conditions that exist at the time of the taking but are discovered subsequent to the taking.[17] In the context of environmental contamination conditions, the condition can be taken into account only to determine any impact stigma may have on the value of the property.

■ Here, the contamination was a condition that existed on the date of the taking. Shortly after the taking, but long before the court-appointed commissioners' award and subsequent trial, MHA discov-

---

17. Some courts conclude evidence of conditions that existed at the time of the taking but could have reasonably been discovered on or before the valuation date is admissible. *Hughes*, 986 P.2d at 704 ("Evidence discovered after the filing of a condemnation action, and that could fairly be brought forward ... should not be excluded."). Other courts conclude that evidence of any condition that existed at the time of the taking is admissible, whether the condition was easily discoverable or not. These courts in the latter group assume the buyer and seller are all-knowing.

*Shein*, 662 A.2d at 1024 (" '[K]nowledgeable parties['] ... are individuals who are aware of all relevant information at the time of valuation whether or not such information is easily available."). Because the contamination on Anda's property was reasonably discoverable on the date of the taking and could have fairly been brought forward by a hypothetical buyer, we need not, and do not, decide whether in Minnesota we assume hypothetical parties have perfect knowledge or reasonable knowledge.

ered the fuel contamination on Anda's property. Despite this subsequent discovery, it is undisputed that the contamination did not occur after or result from the taking. In a willing transaction, a buyer of commercial property such as the Holiday Office Park would have had the opportunity to conduct a Phase I ESA assessment of the property and would likely have discovered the problematic storage tank and fuel-oil contamination that resulted from the tank's deterioration. Thus, this knowledge would have factored into the price a willing buyer would have paid a willing seller for the property. We have already stated that evidence of factors that affect what a willing buyer would pay a willing seller may be considered. *See Strom*, 493 N.W.2d at 559. Accordingly, we conclude that the fact that the contamination of Anda's property was discovered sometime in August 2001—more than one month after the taking date—does not preclude, under the facts at issue here, the consideration of the contamination to the extent necessary to determine if there is any loss of value to the property due to the stigma of contamination.

### IV.

The rule we have articulated today provides that when the government condemns property that is contaminated at the time of the taking, the property should be valued as of the date of the taking, but should be valued "as remediated" rather than as contaminated or as clean. If the property is contaminated at the time of the taking but neither party knows of the contamination, contamination discovered later can be considered for the limited purpose of determining the value of the property as remediated.[18] Estimations of or the actual cost of remediation are not admissible, and condemnation awards should not be reduced dollar-for-dollar by the cost of remediation.

We now apply this rule to the facts of this case. Anda's property was contaminated at the time of the taking, July 2, 2001. Under the rule we adopt today, his property should be valued on that date "as remediated," that is, as property that was once contaminated, but has gone through a remediation process. The fact that the parties discovered the contamination after the date of the taking does not change our conclusion; it does not require that Anda's property be valued as if it were clean—that is to say, never contaminated. Anda is entitled to a new condemnation award trial because evidence of remediation costs was admitted at his trial and used to determine the amount he was awarded as damages for the taking. A new trial is also necessary because although the jury valued his property both "as clean" and "as contaminated," the jury did not value the property as remediated. At a new trial, the fact finder can consider the past fuel-oil contamination, but only to determine whether the stigma of that former contamination affects the fair market value of the remediated property. Finally, because remediation costs are not admissible, the trial should not be consolidated with any other claims or actions as happened here.

### V.

Anda also contests the lower courts' conclusion that he is liable for the contamina-

18. Our holding raises the question of whether at some point in time such after-discovered contamination evidence cannot be used to determine the value of the property as remediated. Possible deadlines for discovering conditions of condemned property could be the date the commissioners' award is filed or a later date when the district court takes evidence upon de novo review if the commissioners' award is appealed. It is not necessary for us to address this question because it was not argued or briefed and here, the contamination was discovered well before the commissioners filed their award.

tion of adjoining properties. As discussed above, MEDA brought a tort action against Anda, alleging that Anda is liable for the contamination of two other parcels—Parcels I and II—also acquired by MHA for the development project. In its complaint, MEDA claimed that pollutants "percolated" and "escape[d]" from the storage tank located on Anda's property and "migrate[d]" onto Parcels I and II. The tort action was consolidated and tried with the condemnation proceeding. MEDA prevailed in the tort action when the jury found Anda liable for the contamination of Parcels I and II and awarded MEDA $474,512 in damages.[19]

Based on the evidence at trial and the facts found by the jury on the special verdict form, the district court concluded in its order for judgment that Anda is liable for contamination of Parcels I and II under three alternative theories of liability: negligence, private nuisance, and strict liability. Anda appealed the judgment of liability. The court of appeals affirmed the district court without addressing negligence or strict liability because the court of appeals concluded that Anda failed to challenge the jury's finding of liability based on nuisance, and this theory was dispositive. *See Moorhead*, 2008 WL 4705663, at *2. More specifically, the court explained, "Because the jury's nuisance finding provides a basis for the court's conclusion of [Anda's] liability for contamination, we affirm the [district] court's order." *Id.* The court of appeals explained that it did not address negligence or strict liability because the damage award would stand on the ground of nuisance even if it were to find in Anda's favor on the negligence and strict liability issues. *See id.* On appeal to our court, Anda challenges each of the theories of liability and argues that the liability award cannot be sustained on any of the three theories.

*Waiver*

We first address MEDA's argument that Anda waived our consideration of liability, because Anda failed to preserve the nuisance issue for review and the nuisance issue is dispositive. MEDA asserts that in Anda's principal brief to the court of appeals, he challenged only two of the three theories that provided a basis for the district court's conclusion of liability. MEDA claims that Anda challenged the strict liability and negligence theories, but failed to challenge the nuisance theory. MEDA argues that as a result, the judgment of liability must be affirmed because the unchallenged nuisance theory provides the basis for the liability award.

Anda admits he did not explicitly challenge the nuisance theory in his principal brief to the court of appeals. Anda contends, nonetheless, that his challenge of the negligence basis for liability in his initial brief to the court of appeals was sufficient to challenge the nuisance theory because there can be no nuisance without negligence. He also asserts that the nuisance and negligence claims were conflated at trial. In support of his position, Anda cites the district court's reference to "negligent nuisance," during a discussion regarding jury instructions with the attorneys and the court's jury instruction which stated that a finding of nuisance requires negligent or wrongful conduct. Alternatively, Anda argues that he raised the nuisance issue by explicitly challenging the nuisance basis of liability in his reply brief to the court of appeals.

**19.** The damage award mirrors the figures MEDA presented at trial as the costs it incurred to remediate Parcels I and II.

Anda's former argument—that his explicit challenge of the negligence theory in his principal brief to the court of appeals was sufficient to challenge the nuisance theory—lacks merit. Negligence and nuisance are not identical theories. Though we have acknowledged that "[g]enerally a nuisance presupposes negligence," *Mokovich v. Indep. Sch. Dist. of Virginia, No. 22,* 177 Minn. 446, 449, 225 N.W. 292, 293 (1929), we have stated that "negligence is not necessarily one of the material elements of either trespass or nuisance," *H. Christiansen & Sons v. City of Duluth,* 225 Minn. 475, 480, 31 N.W.2d 270, 274 (1948). We have also explained that "[t]here may be instances where a nuisance is created or exists without negligence as its primary cause." *Mokovich,* 177 Minn. at 449, 225 N.W. at 293. Because nuisance and negligence are distinct theories, Anda's challenge of the negligence theory was inadequate to challenge the nuisance theory. We therefore conclude that Anda failed to challenge the nuisance basis of the judgment in his principal brief to the court of appeals.

■■■ Our conclusion that Anda failed to raise the nuisance theory in his principal brief before the court of appeals does not necessarily mean that Anda has waived any review of the lower courts' findings and conclusions on liability. As stated above, Anda also argues that the nuisance issue was not waived because he explicitly raised the nuisance theory in his reply brief to the court of appeals. We have stated that raising issues for appeal in one's reply brief is "not proper practice and is not to be permitted." *See Larson v. Degner,* 248 Minn. 59, 63, 78 N.W.2d 333, 336 (1956). In the past, we have declined to consider issues raised for the first time in a reply brief, particularly when the theory was not raised at the district court level. *See, e.g., State v. Paige,* 256 N.W.2d 298, 304 (Minn.1977). But we have considered issues or theories a party failed to

raise in its principal brief, especially when those theories were argued at the district court level and both parties addressed the theory in their briefs. *See Carl v. De Toffol,* 223 Minn. 24, 27–28, 32–33, 25 N.W.2d 479, 481, 483–84 (1946) (reviewing three assignments of error made for the first time by appellants in their reply brief); *Larson,* 248 Minn. at 63, 78 N.W.2d at 336.

Here, MEDA, in its complaint, alleged that Anda was liable for the contamination of Parcels I and II under a nuisance theory and both parties had the opportunity to present their arguments regarding nuisance to the district court and jury. And though Anda did not properly challenge the nuisance theory in his principal brief to the court of appeals, he did challenge the theory in his principal brief to our court, and MEDA had the opportunity to respond to that challenge. Further, the broader issue of Anda's liability was fully raised and litigated before the district court, court of appeals, and our court. Consequently, we conclude that Anda did not waive review of the issue of liability for the contamination of Parcels I and II.

*Jury's Finding of Liability*

■■ After trial, the district court denied Anda's motion for judgment as a matter of law. Anda appealed the court's denial of the motion. We review de novo a district court's decision to deny a motion for judgment as a matter of law. *Gilbertson v. Leininger,* 599 N.W.2d 127, 130 (Minn.1999). We have said that when a district court considers a motion for judgment as a matter of law, it "must view the evidence in the light most favorable to the jury verdict, and should not grant [the motion] unless the evidence is practically conclusive against the verdict and reasonable minds can reach only one conclusion, (or) the jury's findings are contrary to the law applicable in the case." *Diesen v.*

*Hessburg,* 455 N.W.2d 446, 452 (Minn. 1990) (citation omitted) (internal quotation marks omitted). We have also said, "An answer to a special verdict question should be set aside only if it is perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons." *Kelly v. City of Minneapolis,* 598 N.W.2d 657, 662 (Minn.1999) (citation omitted) (internal quotation marks omitted).

■■■ We note that the Eighth Circuit has held that if a determination of liability is based on more than one ground, a verdict should be sustained if the plaintiff is entitled to recover on the basis of one of the grounds. *See Hinkle v. Christensen,* 733 F.2d 74, 76 (8th Cir.1984). In essence, this means that if the plaintiff is entitled to recover on one ground, a court need not consider the other grounds. *Id.* We agree. Here, because MEDA sought damages on three grounds, we need only conclude that MEDA is entitled to recover on the basis of one of its liability theories to sustain the liability damage award. *See id.* MEDA's tort action was based on three separate theories: negligence, private nuisance, and strict liability. Therefore, we review the jury's finding of liability to see if it can be sustained on any one of these three theories.

At trial MEDA claimed that Anda's negligence caused the contamination of Parcels I and II. The jury agreed, finding that Anda or his partners or agents were "negligent in the maintenance of the underground storage tank" and that such negligence was "a direct cause of the contamination." If MEDA is entitled to recover on the basis of its negligence claim, or, more specifically, if the evidence is not practically conclusive against the jury's negligence finding, MEDA prevails.

*Negligence*

■■■ There are four elements of negligence: (1) the existence of a legal duty, (2) a breach of that duty, (3) causation, and (4) injury. *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.1995). An individual owes a plaintiff a duty if the injury to the plaintiff was foreseeable. *See Austin v. Metropolitan Life Ins. Co.,* 277 Minn. 214, 217, 152 N.W.2d 136, 138 (1967). If the injury is foreseeable, the duty owed to the plaintiff is one of ordinary care. *See Klingbeil v. Truesdell,* 256 Minn. 360, 366, 98 N.W.2d 134, 139 (1959). In *Klingbeil,* we explained ordinary care, stating "[t]he standard by which the conduct of a person in a particular situation is to be judged in determining whether he was negligent is the care which an ordinarily prudent man would exercise under like circumstances." *Id.* at 366, 98 N.W.2d at 139. Here Kjos, the property manager and Anda's agent, knew that there was a storage tank on Anda's property, and it was foreseeable that fuel oil in the storage tank could leak into the soil and contaminate neighboring properties. The evidence was not practically conclusive against the finding that the injury was foreseeable and therefore Anda had a duty to act with ordinary care.

■■■ The next question is whether Anda breached that duty. Evidence at trial suggested that the storage tank contained fuel oil and was periodically filled during Anda's ownership of the property. Anda became a part-owner in January 1972 and a Mattson employee testified that he filled the tank every two weeks until 1972 or 1973. Anda testified that Kjos, who became property manager when Anda acquired his ownership interest, admitted to Anda that he bought fuel oil. Similarly, the testimony of Kjos demonstrates that the decision to discontinue filling the tank occurred sometime after Anda became an owner. Moreover, we conclude that the

evidence shows that Anda or Kjos should have known there was a problem with the tank. Even though fuel oil was not being used to heat the building, Mattson Oil was able to add oil to the tank every two weeks. A reasonable person would realize the fuel oil, not being burned by the furnace, must be going somewhere and that the tank was leaking. Under similar circumstances, a reasonable person would investigate what was happening to the fuel oil and take appropriate action, including stopping the refilling of the tank as well as stopping the leak and preventing its spread onto adjacent property. Therefore, we conclude that the evidence was not practically conclusive against the conclusion that Anda breached the duty of ordinary care.

■ Addressing the causation element of negligence, there was evidence that the storage tank was the source for the contamination of Parcels I and II, and that the fuel-oil leak occurred during the time Anda had an ownership interest in the property. When excavators removed the storage tank it was severely corroded, and the contamination was concentrated at the tank site and had spread out from there. After the taking and an inspection of the property, Liesch Associates determined that most of the fuel-oil release likely occurred during Anda's ownership, and one of its employees testified that the tank was the single source of contamination. Therefore, the evidence was not practically conclusive against the finding that Anda's negligence caused the MEDA injury. Finally, as to the damage element of negligence, the existence of fuel-oil contamination on Parcels I and II and the resulting injury to MEDA is not disputed.

Viewing the evidence in the light most favorable to the jury verdict, we conclude the district court did not err when it denied Anda's motion for judgment as a matter of law as the evidence was not prac-

tically conclusive against the finding of negligence, nor were the jury's findings contrary to law. Further, the jury's answers on the special verdict form that stated Anda was negligent in the maintenance of the underground storage tank and that negligence caused the contamination of Parcels I and II were not perverse or palpably contrary to the evidence. Therefore, we hold that the district court did not err when it denied Anda's motion for judgment as a matter of law.

Because we conclude that the jury's verdict that Anda was liable for the contamination of Parcels I and II can be sustained on grounds of negligence we do not need to consider the alternative theories of nuisance or strict liability. *See Hinkle,* 733 F.2d at 76.

## VI.

■ Our affirmance of the district court's finding of liability in the contamination action does not dispose of Anda's argument that he is entitled to a new trial on the issue of damages. Anda claims that the district court erred when it denied his request for a comparative fault instruction. At trial, Anda asked the court to instruct the jury on the issue of MHA's comparative fault and to include a comparative fault question on the jury's special verdict form. The court refused to instruct the jury on comparative fault and refused to submit the comparative fault question, finding that MHA did not owe a duty to Anda nor did MHA's conduct breach any duty. Anda argues that the denial of a comparative fault instruction was error because MHA was contributorily "at fault" in the cleanup of the contamination on Parcels I and II. *See* Minn.Stat. § 604.01 (2008) (stating that "fault" includes "unreasonable failure to avoid an injury or to mitigate damages")

Anda asserts that MHA was at fault because it signed a clean site contract with Hegg Companies and condemned Anda's property before conducting an environmental assessment, even though the storage-tank vent pipe was visible. Anda also points out that MHA did not allow itself enough time after the taking to reasonably prepare the property for transfer to Hegg Companies, did a poor job of negotiating the cleanup contract with Mark II, and as a result MHA conducted an unreasonably expensive cleanup. MEDA responds by asserting that Anda failed to establish that MHA owed any duty to Anda and failed to establish a breach of a duty.

■ The issue of whether the district court erred by refusing to submit the question of MHA's comparative fault to the jury is a mixed question of law and fact. *See Indep. Sch. Dist. No. 622 v. Keene Corp.*, 511 N.W.2d 728, 730 (Minn. 1994), *overruled on other grounds by Jensen v. Walsh*, 623 N.W.2d 247 (Minn.2001). We need not give deference to a district court's legal conclusions and "may correct erroneous applications of the law." *Maxfield v. Maxfield*, 452 N.W.2d 219, 221 (Minn.1990). But we review determinations of fact under an abuse of discretion standard. *Id.*

The Minnesota Comparative Fault Act, Minn.Stat. §§ 604.01–.04 (2008), governs the affirmative defense of comparative negligence or comparative fault. The Act allows the comparison of a defendant's fault against the fault of the plaintiff.[20] Minn.Stat. § 604.01, subd. 1. Under Minnesota law, contributory negligence on the part of a plaintiff does not bar recovery unless the plaintiff's fault is greater than the defendant's, "but any damages allowed must be diminished in proportion to the amount of fault attributable to the person recovering." *Id.* The Act further explains, "The court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each party." *Id.* We have explained that use of the word "shall" must be read in conjunction with case law regarding the submission of this comparative fault to juries and that there must be evidence that tends to demonstrate a party's fault before the issue may be presented to a jury. *Keene Corp.*, 511 N.W.2d at 730.

An "unreasonable failure to avoid an injury or to mitigate damages" is one type of fault described and required to be considered under the comparative fault scheme articulated by the Act. Minn.Stat. § 604.01, subd. 1a. Such fault is different from negligence that causes the accident or the injury-inducing event. *See id.* ("'Fault' includes acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability."). And such fault "may be considered only in determining the damages to which the claimant is entitled. It may not be considered in determining the cause of an accident." *Id.* The failure to avoid injury or mitigate damages—rather than injury-causing negligence—may be at issue in this case because Anda asserts that MHA had a duty to mitigate its damages by limiting its remediation costs.

More specifically, Anda asserts there is evidence that tends to demonstrate that MHA "unreasonabl[y] fail[ed] to avoid an injury or to mitigate damages." MHA was acting under a self-imposed schedule that

---

20. Here, MEDA is the plaintiff. But as MHA's assign, MEDA has no greater right to recover than MHA would have, and any contributory negligence on the part of MHA should be treated as if it were MEDA's for purposes of damages and should be assessed against MEDA.

was very tight. It had approximately six weeks from the time MEDA acquired title and possession to Anda's property to transfer a "clean site" to Hegg Companies. In fact, MHA signed a contract with Hegg Companies before MHA completed any investigation or environmental assessment of the property. MHA chose the most thorough and expensive remediation method when it removed all the contaminated soil and replaced it with clean soil. Testimony at trial established that a property owner could have addressed the contamination in a less costly manner by removing the most contaminated soil and monitoring and venting the remaining soil. On cross-examination, one of MEDA's witnesses testified that this remediation option would have cost $100,000 to $150,000. Under this option, the property would still be contaminated, and there would still be additional costs associated with ongoing monitoring of the contamination. Nonetheless, the witness acknowledged the remediation would have been in compliance with Minnesota Pollution Control Agency (MPCA) requirements.

MHA did not seek to recover reimbursement of its remediation costs from any other source, including the Petrofund. *See* Minn.Stat. § 115C.09. While it is difficult for us to determine with any certainty from the record before us whether the Petrofund Board would have given funds for the remediation of Parcels I and II—and if so, how much—a MPCA employee testified at trial that as a "responsible person" or "volunteer," MEDA could have qualified for remediation reimbursement of up to $1 million for investigation and cleanup of fuel-oil contamination under the Petroleum Tank Release Cleanup Act. *See id.*

Additionally, there was evidence that MHA's self-imposed time pressures affected the cost of cleanup. Once MHA discovered the defective storage tank, it had approximately seven days to complete the excavation, and "due to the magnitude of the release and the need to expedited [sic] the removal of impacted soil from the vicinity of the storage tank," MHA used an onsite mobile laboratory to test soils. MHA only received one bid for the excavation, and eventually had a dispute with the sole bidder, Mark II, regarding how the excavation costs were to be calculated. MHA took that dispute to arbitration and lost—a loss that resulted in MHA paying Mark II $687,775 more than MHA believed it owed Mark II.

We conclude that the issue of comparative fault should have been presented to the jury because all of the foregoing evidence tends to demonstrate MHA may have been at fault by "unreasonabl[y] fail[ing] to avoid an injury or to mitigate damages."[21] *See* Minn.Stat. § 604.01, subd. 1a; *Keene Corp.*, 511 N.W.2d at 730. Therefore, we conclude that the district court erred when it refused to submit a comparative fault instruction and question to the jury.

▮▮▮▮ Having concluded that the district court erred when it failed to submit the issue of comparative fault to the jury, we must next determine whether the court's error requires remand for a new trial on damages. A jury-instruction error is fundamental and warrants a new trial if it "destroy[s] the substantial correctness of the charge as a whole, causes a miscarriage of justice, or result[s] in substantial prejudice." *Lindstrom v. Yellow Taxi Co.*

---

**21.** We also disagree with MEDA's argument that it did not owe Anda a duty. The Minnesota comparative fault statute requires entities or individuals that suffered damage as a result of the negligent actions of another to avoid injury and to mitigate damages. Minn. Stat. § 604.01, subd. 1a.

*of Minneapolis,* 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974).

Here, there was no instruction regarding comparative fault and the jury was not asked on the special verdict form to compare fault or assign fault percentages. The district court did not "direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each party." *See* Minn.Stat. § 604.01. We conclude that the court's error warrants a new trial on the issue of damages because the failure to instruct the jury on comparative fault destroyed the substantial correctness of the jury's charge as a whole. *See Lindstrom,* 298 Minn. at 229, 214 N.W.2d at 676.

## VII.

Anda's final argument is that the district court should have granted him a new trial because the court's conduct rendered a fair and impartial determination by the jury improbable. Anda claims the court interrupted Anda's counsel during his examination of witnesses and his closing argument and made evidentiary rulings even though MEDA had not made an objection. Additionally, Anda claims that the court exhibited hostility toward Anda when, in the presence of the jury, it characterized Anda's counsel's examination of witnesses as "wildly speculative" and it ordered Anda's counsel to ask hypothetical questions that were "within the realm of reason or remotely possible." Anda asserts that the court's conduct demonstrated a bias that prejudiced his case and requires a new trial. MEDA argues that the court properly intervened during the trial to preserve the integrity of the trial proceedings. MEDA maintains that Anda's counsel engaged in misconduct because he "testified" while examining witnesses and violated the court's evidentiary rulings and orders.

■ We review a district court's new trial decision under an abuse of discretion standard. *Halla Nursery, Inc. v. Baumann–Furrie & Co.,* 454 N.W.2d 905, 910 (Minn.1990). We must therefore determine whether the court abused its discretion in denying Anda a new trial on grounds of its own conduct. In *Fortier v. Ritter's Hairdressing Studios, Inc.,* we said, "The influence which a trial judge has over lay jurors ... is so great that he must be extraordinarily careful to avoid all acts, signs, words, gestures, or tones of voice which might indicate to the jury either hostility or partiality toward a litigant or counsel." 282 Minn. 382, 385, 164 N.W.2d 897, 899 (1969).

■ In *Fortier* we also acknowledged that a district court "must have the power to discourage and eliminate impropriety or misconduct by attorneys at trial," but we were hesitant to approve even a "guarded and temperate reprimand in the presence of the jury." *Id.* While we agree that a court must be allowed to act to arrest and prevent impropriety or misconduct by attorneys, we have stated that "it is almost always preferable" that the reprimand not be made in the jury's presence because such reprimands are likely to influence the jurors. *See id.* at 386, 164 N.W.2d at 899. In *Hansen v. St. Paul City Ry. Co.,* we described what conduct is appropriate, and what conduct is inappropriate by stating:

> While it is undoubtedly within the province of the trial judge to admonish and rebuke counsel when guilty of misconduct, it is improper for him to unduly criticize counsel in the presence of the jury or make remarks in the course of the trial showing bias in favor of one of the parties or which will tend to incite hostility or prejudice in the minds of the jury toward one party and sympathy for another.

231 Minn. 354, 360–61, 43 N.W.2d 260, 264 (1950). With regard to sua sponte evidentiary rulings, we have said that a district court "should refrain from remarks which might injure either of the parties to the litigation." and the court "should not act as counsel for a party by raising objections which the party should make." *Id.*

■ Here, Anda does not argue that the district court's evidentiary rulings were incorrect. Further, the court had a duty to interject in instances where Anda's counsel failed to heed the court's earlier admonitions and rulings. *See Fortier,* 282 Minn. at 385, 164 N.W.2d at 899. During closing argument, for example, Anda's counsel failed to follow instructions regarding the scope of the argument. Counsel for both parties and the court agreed that Anda's counsel would argue first, addressing only the liability action, and then MEDA would make its closing argument. Then, in accordance with Anda's right as a property owner to make the last closing argument, Anda's counsel would get a second argument to address the condemnation action. Anda's counsel was explicitly instructed to avoid discussing the value of Anda's property in his first closing argument. Yet, Anda's counsel repeatedly discussed the value of Anda's property in his first closing argument, and the court admonished Anda four times during the argument. The following are examples of how the court admonished Anda's counsel during the closing argument:

> [Anda's counsel]: We think we had a $2 million building here, and so we appealed from the condemnation award of roughly $488,000. We had no choice about the fact that the building was taken from us, we felt that the condemnation award was—
>
> The Court: [Counsel], that's the second argument. Please don't go into that now.
>
> . . .

[Anda's counsel]: The government had argued in the condemnation case before the commissioners that [M.A.], the appraiser from St. Cloud, there—

> The Court: [Counsel,] that is not an issue in this case. Please remember, we're not going to give you two arguments on the same issue.

We conclude that some of the court's admonitions, like the foregoing, were benign and necessary to preserve the integrity of the trial, especially in light of the court's earlier ruling that Anda's counsel was to refrain from discussing the value of Anda's property in his first closing argument. The court made appropriate, measured responses in order to enforce its earlier ruling.

■ But we conclude that some of the court's other conduct is troublesome. Several times the court sua sponte ruled that Anda's counsel's questions during direct or cross-examination were irrelevant, speculative, or otherwise inadmissible even though MEDA had not objected to the questions.

> The Court: [Counsel], I don't see where you're going with this. This gentleman is a city assessor. In the absence of some indication that his scope of his employment has to do with these kind of departments that you are asking him about, it seems to me that it's irrelevant. And, frankly, I don't know, it's a waste of time.
>
> [Anda's counsel]: I'll move on, Your Honor. Thank you.
>
> The Court: Thank you.
>
> . . .
>
> The Court: [Counsel], I am going to rule that this line of questioning is beyond the scope of direct examination, and it's improper to assume facts which are not in evidence, which is what you are doing. So don't ask any more hypothetical questions of this witness as to

what someone else may or may not have said.

[Anda's counsel]: Thank you, Your Honor. Very good.

This type of conduct contravened our instruction in *Hansen* that a district court must not show its bias against a party and "should not act as counsel for a party by raising objections which the party should make." *See Hansen*, 231 Minn. at 360, 43 N.W.2d at 264. Further, these admonitions were less measured and controlled than others. If the court believed it needed to intervene, its admonitions should have been more restrained.

In prior case law, we have attempted to make clear that district courts should refrain from raising objections and should avoid demonstrating bias against one party in front of the jury. We have also said we will grant a new trial based on judicial conduct "only in those rare cases where the remark of the trial judge was so prejudicial to one party that it rendered a fair and impartial determination by the jury improbable." *Fortier*, 282 Minn. at 386, 164 N.W.2d at 899–900. Here, most of the court's comments were evidentiary rulings aimed at arresting or preventing misconduct and maintaining control of the proceedings rather than criticisms or overt reprimands in the jury's presence. With regard to the court's comments during Anda's closing argument, the court was responding to Anda's failure to follow instructions. The court's conduct was often necessary, and was not so prejudicial as to poison the jury's mind or set the jury against Anda. Further, we note and appreciate the court's frustration with Anda's counsel's inability to follow the court's directions and sometimes cumbrous examination of witnesses. Nevertheless, the court in certain situations should have demonstrated more restraint and objectivity. That said, we conclude that the court's conduct does not require a new trial because the court's conduct did not "render a

fair and impartial determination by the jury improbable." *Id.*, 164 N.W.2d at 899–900

For all the foregoing reasons, we reverse the court of appeals and remand to the district court for further proceeding consistent with this decision.

Reversed and remanded.

Concurring in part, dissenting in part, DIETZEN, J.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

DIETZEN, Justice (concurring in part, dissenting in part).

In this consolidated proceeding, the Moorhead Economic Development Authority (MEDA) brought a contamination liability action involving two parcels of land adjacent to property owned by Roger Anda (Parcels I and II), and a condemnation action to acquire a parcel of land owned by Anda (Anda property). In the contamination liability action, MEDA asserts that Anda is liable for the contamination of Parcels I and II. The majority concludes, and I agree, that the jury verdict finding Anda liable for the contamination of Parcels I and II should be affirmed, but that a new trial is required on the issue of damages.

The majority concludes that justice requires the case be remanded for a new trial to determine just compensation due Anda for the taking of Anda's property. In so doing, the majority adopts a new rule that the costs of remediation of contaminated property generally are not admissible in a condemnation proceeding and that condemned property must be valued as remediated. Because I conclude that the new rule of exclusion adopted by the ma-

jority is contrary to existing law, I respectfully dissent.

Whether the costs of remediation of environmental contamination are admissible requires consideration of the measure of damages in a condemnation proceeding, and analysis of the type of evidence relevant to determine fair market value of the property. The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13. The intent of Minnesota law is to provide property owners "just compensation" for property taken by the government through the power of eminent domain. *Id.* Just compensation includes all elements of value of the property, but "it does not exceed market value fairly determined." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *Minneapolis–St. Paul Sanitary Dist. v. Fitzpatrick,* 201 Minn. 442, 449, 277 N.W. 394, 398–99 (1937). The "equivalent" of just compensation is the fair market value of the property at the time of the taking. *See Hous. & Redevelopment Auth. of St. Paul v. Kieffer Bros. Inv. & Constr. Co.,* 284 Minn. 516, 520, 170 N.W.2d 862, 864 (1969); *Fitzpatrick,* 201 Minn. at 449, 277 N.W. at 398–99; *see also* 4 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Civil,* CIVJIG 52.35 (5th ed.2006) (stating that "just compensation" is the fair market value of the property that was taken).

Thus, the measure of damages for the taking of the Anda property is the fair market value of the property as of the date of taking. Our case law is clear that fair market value is the equivalent of just compensation. *See City of St. Paul v. Rein Recreation, Inc.,* 298 N.W.2d 46, 49 (Minn. 1980). The majority erroneously concludes that "just compensation" is not the same as fair market value in this case.

The majority has not articulated any basis for overruling our precedent or indicated why fair market value is not the proper measure in this case.

It is well established that in determining fair market value, " '[a]ny competent evidence may be considered if it legitimately bears upon the market value' " of the property. *State by Humphrey v. Strom,* 493 N.W.2d 554, 558 (Minn.1992) (quoting *Ramsey County v. Miller,* 316 N.W.2d 917, 919 (Minn.1982)); *accord Rein Recreation,* 298 N.W.2d at 50. In *Rein Recreation,* we stated the general rule is that evidence of any matter that would influence a prospective purchaser and seller in fixing the price at which a sale of the property could be consummated may be considered. 298 N.W.2d at 50.

The majority of those jurisdictions that have considered the issue have concluded that the costs of remediation affect fair market value and therefore are admissible. *See generally* 4 Julius L. Sackman, *Nichols on Eminent Domain* § 13.10 (3d ed.2009). For example, the Connecticut Supreme Court has held that the costs of remediation of contaminated property are relevant to determine the value of property taken by eminent domain because such evidence would impact a market transaction between a willing buyer and seller. *Ne. Conn. Econ. Alliance, Inc. v. ATC P'ship,* 256 Conn. 813, 776 A.2d 1068, 1080 (2001). The court observed that "[i]t blinks at reality to say that a willing buyer would simply ignore the fact of contamination" and specifically the costs of remediation in determining the value of the property. *Id.; see also Redevelopment Agency v. Thrifty Oil Co.,* 4 Cal.App.4th 469, 5 Cal.Rptr.2d 687 (1992); *Nat'l Compressed Steel Corp. v. Unified Gov't of Wyandotte Cnty./Kansas City,* 272 Kan. 1239, 38 P.3d 723, 735 (2002); *City of Olathe v. Stott,* 253 Kan. 687, 861 P.2d 1287, 1290 (1993); *Ten-*

*nessee v. Brandon,* 898 S.W.2d 224 (Tenn. Ct.App.1995); *cf. Finkelstein v. Dep't of Transp.,* 656 So.2d 921, 922 (Fla.1995) (holding that admissibility of contamination evidence is limited to those cases where "there is a sufficient factual predicate upon which to conclude that the contamination does affect the market value of the property taken").[1]

In my view, the costs of remediation of contaminated property are admissible in a condemnation proceeding provided that the costs directly impact the value of the property. Two reasons support my conclusion. First, Minnesota's condemnation jurisprudence favors the admissibility of any competent evidence that legitimately bears upon the fair market value of the property. It is not disputed that the costs of remediation bear upon the fair market value of the property. Therefore, the costs of remediation are admissible, provided that the condemning authority establishes that the costs directly impact the value of the property.

Previously, we affirmed the decision of the Minnesota Tax Court that the subject property had zero market value due to environmental contamination. *Westling v. County of Mille Lacs,* 543 N.W.2d 91, 93 (Minn.1996). In *Westling,* the tax court accepted appraiser expert testimony that the costs of remediation and stigma of the contamination reduced the market value of the property. *Id.* at 93. In doing so, we accepted the conclusion that environmental contamination is relevant to determine market value.

If environmental contamination, including the cost of remediation, is admissible in a tax court proceeding, it ought to be admissible in a condemnation proceeding. The valuation question in a condemnation and tax court proceeding is identical— what is the market value of the property on the relevant valuation date. *Compare Rein Recreation,* 298 N.W.2d at 49 (just compensation is "measured by market value at the time of taking"), *with* Minn.Stat. § 278.01 (2008) (property owner may challenge property taxes on ground that assessed value is too high), *and* Minn.Stat. § 273.11 (2008) (subject to exceptions not applicable, all real property subject to taxation "shall be valued at its market value"). The result of the majority rule excluding the costs of remediation means that the market value of the same property would be significantly different in a condemnation proceeding under chapter 117 than in a tax court proceeding under chapter 278. Such a result is illogical and contradictory.[2]

Second, the Legislature has already determined that the costs of remediation are admissible in a condemnation proceeding. The last sentence of Minn.Stat. § 117.085 provides:

> The commissioners shall, if requested by any party, make an express finding of the estimated cost of removal and remedial actions that will be necessary on the taken property because of existing environmental contamination.

**1.** Moreover, the Appraisal Institute has concluded that "the existence of one or more adverse environmental conditions can reduce the market value of real property interests in a site," and therefore should be considered. Appraisal Institute, *The Appraisal of Real Estate* 224–25 (13th ed.2008); *see also* Appraisal Institute advisory opinion 9.

**2.** The majority argues that different value determinations obtained in different forms are

not "problematic." I disagree. Here, the jury found that the Anda property had a value as contaminated of zero and without contamination of $455,000. It is illogical and contradictory to have different market value determinations for the same property that depend solely on whether it was considered in a condemnation or tax court proceeding.

This provision of the statute has been in effect since 1991. The premise of the statute is that the costs of remediation are admissible. Otherwise, the commissioners could not make the findings contemplated by the statute. Since the evidence is admissible in condemnation hearings, there is no basis to exclude it in the district court. Thus, the Legislature has already determined that the costs of remediation are admissible in a condemnation proceeding.

The majority raises general concerns over the "fairness" to a property owner of reducing a condemnation award for the costs of remediation, particularly when the property is not responsible for the contamination. But the majority's "fairness" concerns conflate the issue of fair market value of the property in a condemnation proceeding with the issue of responsibility for the contamination in an environmental contamination action. The purpose of the condemnation proceeding, however, is to determine the fair market value of the subject property, not to determine which party is responsible for the contamination. Thus, the "fairness" issue is best resolved in an environmental contamination action.

Moreover, the majority's new rule requires that the condemned property be valued as remediated, and not as it existed on the date of the taking. Of course, the

difference between the value of the property as is, and as remediated, is the costs of remediation.[3] Pursuant to the new rule, the condemning authority must pay a condemnation award that includes not only the market value of the property, but also the costs of remediation. Presumably, the condemning authority may bring a separate environmental contamination action (or pursue other remedies) to recover the costs of remediation. But just compensation does not require that the condemning authority pay more than the market value of the property. Requiring the condemning authority to pay the costs of remediation is outside the bounds of just compensation.

The majority contends that admitting the costs of remediation exposed the property owner to "double liability"—once in the condemnation proceeding by reducing the value of the property, and again as a responsible person under the Minnesota Environmental Response and Liability Act (MERLA), Minn.Stat. ch. 115B (2008), and the Petroleum Tank Release Cleanup Act (PTRCA), Minn.Stat. ch. 115C (2008). But the majority's "double liability" theory did not occur in this case.[4] Moreover, a double recovery is prohibited by statute. Minn.Stat. § 115B.13 (2008).[5]

3. For example, when the value of contaminated property as remediated is $1,000,000 and the costs of remediation are $500,000 the majority would require the condemning authority to pay $1,000,000 even though its fair market value is considerably less.

4. MEDA asserted that the costs of remediation had a negative impact on the value of Anda's property in the condemnation proceeding; and MEDA sued Anda for negligence, nuisance, and strict liability to recover its costs of remediation *only* for the other parcels. Thus, MEDA did not seek to recover the same costs of cleanup twice.

5. The majority suggests that Minn.Stat. § 115B.13 only prohibits a "double recovery"

by a person who recovers response costs or damages pursuant to chapter 115B. I disagree. The second sentence of section 115B.13 broadly applies to the converse situation. Specifically, any person who recovers response costs pursuant to "any other state or federal law" may not recover for the same costs or damages under chapter 115B. *Id.* Thus, when a condemning authority recovers response costs or damages in the form of a reduced condemnation award under chapter 117, it may not seek a double recovery under chapter 115B. Additionally, the right of a property owner to recover the costs of remediation against other responsible parties is explicitly preserved. Minn.Stat. § 115B.12.

Notably, the Legislature has provided protection to condemning authorities for contaminated property subject to MER-LA. *See* Minn.Stat. § 115B.03, subd. 1 (applies to the release or threatened release of a hazardous substance, or pollutant or contaminant as described in the statute). Specifically, a condemning authority is not "a responsible person" under MERLA for the contamination of property it seeks to condemn, and therefore is not liable for the costs of remediation of the condemned property. *Id.*, subd. 5. By requiring the condemning authority to pay the value of the property as remediated, the majority imposes upon the condemning authority the initial obligation to pay the costs of remediation for the condemned property, and then seek to recover those costs through a contribution action. This result appears to contradict the protection given by the Legislature to condemning authorities.[6]

The majority suggests that the fair market value of contaminated property "is often very difficult to find." This conclusion, however, is not based upon any evidence in the record. Moreover, the Appraisal Institute reaches the opposite conclusion. It concludes:

> In recent years, contaminated properties have become more marketable and have begun to change hands with increasing frequency. Such transactions will usually provide sufficient basis for valuing or analyzing a site that may be impacted by environmental contamination.

Appraisal Institute, *The Appraisal of Real Estate* 226 (13th ed.2008).

The majority also argues that "due process concerns" require that costs of remediation not be admissible. But the majority's argument misses the mark. The purpose of a condemnation proceeding is to determine the fair market value of

the property condemned and not to determine liability for the contamination of the property.

Accordingly, Anda is not entitled to a new trial in the condemnation proceeding. Existing case law supports my conclusion. Moreover, the Legislature has already determined that such costs are admissible. It is not the province of this court to second-guess the policy judgments of the Legislature that condemning authorities should not be required to pay the costs of remediation, and that the costs of remediation are admissible in a condemnation proceeding.

---

**6.** It is not clear whether MERLA would apply to Anda's property. But the majority's exclu- sionary rule does apply to the condemnation of all contaminated property.