Reversed and Remanded and Memorandum Opinion filed December 28, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00057-CV

___________________

 

Caffe Ribs, Inc., Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the County Civil Court at Law No. 3

Harris County,
Texas



Trial Court Cause No. 839502

 



 

 

OPINION

          Caffe Ribs appeals
from a judgment on a jury verdict awarding $4.5 million in this eminent domain
proceeding for the State’s whole taking of a 7.5214 acre parcel of land and
improvements.  In multiple issues, Caffe Ribs challenges the trial court’s evidentiary
rulings.  We reverse and remand for a new trial because (1) evidence relating
to an agreement to pay for costs associated with environmental contamination of
the property erroneously was excluded at trial, and (2) exclusion of this evidence
was harmful.

Background

            The State of Texas acquired the subject property as
part of the construction, reconstruction, maintenance, and operation of the
highway system.  The property is located on Old Katy Road near the northwest
intersection of Beltway 8 and Interstate Highway 10.

            The
property was used to manufacture and store oil field equipment beginning in
1955; over the next four decades, these activities resulted in environmental
contamination.  From 1977 to 1988, Weatherford U.S., Inc. owned and used the
property for drilling tool fabrication and repair.  Property improvements
included a parts warehouse, assembly shop, display room, machine shop, and
office.

            Although
the Paul Revere Variable Annuity Insurance Company foreclosed on the property
in 1988, Weatherford maintained operations at the property as a lessee until 1992. 
Paul Revere sold the property to Caffe Ribs for $487,000 in February 1995. 
Under the written agreement between Paul Revere and Caffe Ribs, it was
“expressly understood and agreed that Buyer shall accept the conveyance of the
Property in its present condition, ‘AS-IS, WHERE-IS[.]’”  Caffe Ribs also
agreed “to accept the conveyance of the Property subject to any presently known
or subsequently discovered Hazardous Materials or Hazardous Materials Contamination.” 
Pursuant to this agreement, Paul Revere retained the exclusive right to
evaluate and analyze the property’s environmental condition and to “take such
action as it deems necessary or appropriate, in its sole discretion and
expense, with regard to the environmental condition of the Property.”      

            In
March 1996, Paul Revere and Weatherford executed an “Environmental Remediation
Agreement” in which the parties[1]
acknowledged:

            By Special Warranty Deed with Vendor’s Lien
dated February 16, 1995, Paul Revere conveyed the Property to Caffe Ribs, Inc.,
a Utah, corporation (“Caffe Ribs”).  Paul Revere has agreed with Caffe Ribs to
perform certain environmental work on the Property.  The belief that
environmental work may be necessary is based on certain environmental
assessments previously performed . . . .  The environmental assessments have
detected certain Hazardous Materials Contamination on the Property.  Paul
Revere and Weatherford desire to cooperate in (i) completing certain
environmental assessments, (ii) performing certain environmental remediation work,
and (iii) allocating the costs for such as set forth in this Remediation
Agreement and wish to evidence their agreements hereby.

Using information provided by
a consultant, Paul Revere and Weatherford agreed to determine the extent of
Weatherford’s contribution to the subject property’s contamination.  Weatherford
is responsible for remediation “to the extent of its proportional contribution
to such contamination.”  The Environmental Remediation Agreement states: 
“Without the express written consent of the other party, neither party may
assign this Remediation Agreement nor delegate any duties or obligations
hereunder except as expressly provided herein.”  By January 2005, the State had
executed its own “Remediation and Indemnity Agreement” with Weatherford
International, Inc.

On May 27, 2005, the State filed a petition seeking to
condemn the property.  A Special Commissioners Hearing was held on July 19,
2005; Caffe Ribs, Paul Revere, Houston Community College, Spring Branch
Independent School District, Harris County, and the City of Houston were
jointly awarded $7,372,000 in damages for the condemnation of the property.  Caffe
Ribs and the State filed objections to the Special Commissioners’ award, and
the administrative proceeding was converted into a civil case. 

On August 25, 2005, the State deposited the Special Commissioners’
award into the county civil court at law registry.  On May 15, 2006, the county
civil court at law granted a request by Caffe Ribs and Paul Revere to withdraw
the Special Commissioners’ award.  According to the order, Caffe Ribs was
allowed to withdraw $6,459,500 from the court registry, and Paul Revere was
allowed to withdraw $912,500.

In preparation for trial, Caffe Ribs and the State could
not agree on the use of evidence relating to environmental contamination of the
subject property.  Caffe Ribs subsequently filed a motion to exclude evidence
of environmental contamination.  At the hearing on this motion, Caffe Ribs
focused largely on its argument that the State had agreed to exclude environmental
evidence by virtue of a Rule 11 agreement.  Caffe Ribs also argued:

[T]hese [contamination] issues shouldn’t come forward in
Court because . . . State law requires the responsible party to reimburse the
landowner, which is [Caffe Ribs] in this case, for the expenses of any
environmental cleanup that may occur.  And there . . . was a contract in place
before the date of taking to require Weatherford to cover certain expenses
incurred by [Caffe Ribs] in this case . . . .

During the hearing, the court
opined that both parties were “talking around” the one legal question it
thought relevant, i.e., “What amount of testimony regarding the actual
contamination of the property on the date of taking ought to come in?”  The
court further stated it was “not sure that . . . who’s paying for the
remediation is really addressing that.”  At a later hearing, the court informed
the parties it was going to admit the State’s evidence of contamination.  This
ruling is not challenged on appeal.

Caffe Ribs presented testimony at trial from appraiser
Rudy Robinson, commercial real estate developer David Klein, and environmental
engineer Richard Bost.

Robinson valued the property at $9.9 million.  He
concluded that, as of the date of acquisition, “the property would not suffer .
. . an additional environmental deduction over and above the applicable
remaining cleanup cost, if any.”

On cross-examination, the State challenged Robinson’s
selection of several of his comparable sales; the State contended that the
sales were not comparable because they involved parcels that were not
contaminated.  The State also elicited testimony from Robinson that (1) several
of the substances found on Caffe Ribs’s property were carcinogens, and (2) an
environmental engineering report contained a “strong suggestion” that some of
these cancer-causing chemicals were migrating off site.

During Caffe Ribs’s redirect examination of Robinson,
the following exchange occurred:

            Q.  [BY CAFFE RIBS’S COUNSEL] Have you reviewed
records that indicate who was on the hook to pay for the remediation costs of
any chemicals of concern found underground or in the water at this site?

            A.  Yes.

            Q.  Who was it?

*    *    *

            A.  Weatherford International.

            Q.  The owner, whoever that is — and at this
time it was Caffe Ribs, Incorporated — had the right to get Weatherford
International to pay for any costs of clean up?

            A.  It’s my understanding that . . . they were
identified as the responsible party . . . for whatever cleanup costs were going
to be incurred at the site and indemnification and remediation agreements that
had been executed.

                        THE COURT:  Counsel, approach.

After an unreported bench
conference, Caffe Ribs’s counsel abandoned this line of questioning.

           Klein
testified about the factors he considers in deciding whether to buy a piece of
property.  He opined about several favorable qualities of the subject property,
particularly its location.  On cross-examination, the State elicited Klein’s
testimony that he would “look into” whether a particular property had a plume
of underground solvents or chemicals under it.  Klein identified potential
concerns relating to such a plume focusing on (1) identifying the responsible
party, and (2) determining whether the plume was migrating.  On redirect, Klein
testified that he did not know Caffe Ribs was not the responsible party.  The
court immediately cautioned Caffe Ribs’s counsel:  “And counsel, you’re
approaching —.”

            Bost testified about
the status of remediation on the subject property.  He stated that, as of the
date of acquisition, all known soil contamination had been remediated; he later
acknowledged that additional contamination was found when the State removed
structures after the date of the taking.  Bost also testified about levels of
groundwater contamination.  He opined that, for practical purposes, the primary
source material of the groundwater contamination had been removed.  

            The State
objected when Caffe Ribs’s counsel asked Bost whether a responsible party was
named in records he reviewed from the Texas Commission on Environmental
Quality.  The following exchange occurred between Caffe Ribs’s counsel and the
court:

                        [CAFFE RIBS’S COUNSEL]:  I wasn’t
aware the identification of the responsible party was —

                        THE COURT:  We discussed how much
it cost and you weren’t going to discuss whose responsibility it was. That was [the]
ruling.

                        [CAFFE RIBS’S COUNSEL]:  I thought
the costs themselves is [sic] what we agreed on.

                        THE COURT:  And you are the
responsible party.

Later in the proceedings, the court stated:

The issue is what is the fair market value of the property, it’s not how
much . . . is it going to cost to clean it up and bring it back to where just
anybody would want to buy it.

            The issue is what is the fair market value
on that date and with whatever willing buyer is willing buyer [sic], given as
it is, polluted, unpolluted, mostly remediated, halfway remediated, not
remediated at all.

The court further indicated
that who had to pay for the remediation was irrelevant to the fair market value
of the property.

            During
cross-examination, the State inquired about contamination levels for each test
well on the property and elicited Bost’s testimony that these levels exceeded
the approved level for drinking water.  The State also asked about a cleanup
lasting 17 years at another site where contamination migrated off-site and the
neighboring residents filed a lawsuit because of the pollution.         

In addition to the court’s limitations on the
testimony described above, the court excluded (1) testimony from Bost and
former Texas Commission on Environmental Quality employee Vince Rorick regarding
the State’s alleged interference with remediation on the property, and (2) Rorick’s
testimony about when a certificate of completion would have issued had
Weatherford’s original remediation plan remained in place.  The court also
excluded testimony from appraiser Andrea Fahrenthold, who would have opined that
the property’s market value was $11.5 million without taking contamination into
consideration.

At the end of its case-in-chief, Caffe Ribs presented
offers of proof; these included Bost’s testimony that Weatherford was
responsible for paying remediation costs on the subject property.  Bost further
testified during the offer of proof that Weatherford was responsible to Caffe
Ribs and to any prospective purchaser of the property.  Bost answered “yes” to
a question asking whether Weatherford was “the responsible party in — before
the date of taking to the owner or any prospective purchaser of the subject
property?”  Caffe Ribs’s counsel represented that Rorick would have testified that
Weatherford was the responsible party, and that Rorick believed Weatherford had
been fulfilling its obligation. The State objected to this testimony by Bost
and Rorick. The trial court sustained the objections and excluded the evidence.

 

The State presented testimony from environmental
engineer Ashby McMullan and real estate appraiser David Dominy.[2]  McMullan
concluded that the subject property’s soil and groundwater were contaminated,
and estimated it would take from five to eight years to remediate the
groundwater contamination.

Like Caffe Ribs’s appraiser, Dominy determined that the
subject property’s highest and best use was commercial; however, Dominy disagreed
with Caffe Ribs’s positive analysis of the property’s features.  Based on what
he determined to be comparable sales, Dominy concluded that the subject
property would sell for $10 per square foot (a total of $3,276,330.21) if it were
on the market in a clean condition and ready for development.  Dominy also
considered the contamination issues.  Using a discounted cash flow analysis and
taking into consideration that a complete cleanup of the property would take
eight years, he calculated the present value of the property at $803,431.  He
then subtracted $122,180 for the cost of demolishing the improvements.  His
final value determination was $681,251.  Dominy also testified that a lender
would consider the contaminated nature of the property because, if the borrower
were to default, the lender “would be left holding the bag on the contaminated
property.”

The jury was asked in a single question to determine
the “market value” of the subject property “including improvements thereon,
condemned for highway purposes on August 25, 2005, valued as a fee simple
estate.”  The term “market value” was defined as “the price which the property
would bring when it is offered for sale by one who desires, but is not obliged
to sell, and is bought by one who is under no necessity of buying it . . . .”

The jury was instructed to “tak[e] . . . into
consideration all of the uses to which it is reasonably adaptable and for which
it either is or in all reasonable probability will become available within the
reasonable future.”  The jury also was instructed to consider the “highest and
best use of the land involved.”  The term “highest and best use” was defined as
“the reasonably probable and legal use of vacant land or an improved property,
which is physically possible, appropriately supported, financially feasible,
and that results in the highest value.”  The jury further was instructed that
“[t]he four criteria the highest and best use must meet are legal
permissibility, physical possibility, financial feasibility and maximum
profitability.”

The jury returned a unanimous verdict finding that
the property had a market value of $4.5 million.  The trial court entered
judgment in conformity with the jury’s verdict; based in part on Caffe Ribs’s
prior withdrawal of $6,459,500, the trial court ordered Caffe Ribs to pay the
State $2,872,000.

Caffe Ribs filed a combined motion for new trial, motion
for judgment notwithstanding the verdict, and motion to correct, modify, and
reform the judgment.  The combined motion was overruled.  Caffe Ribs timely
appealed.

Analysis

A.    Overview

Caffe Ribs raises eight issues on appeal.

In its first issue, Caffe Ribs argues that it was
denied a fair trial “on the market value of its property” due to cumulative
error arising from multiple evidentiary rulings about which it complains in
more detail in issues two through five.  

In its second issue, Caffe Ribs contends that, given
the State’s evidence that market value would be significantly affected by
potential environmental liability and remediation cost, the trial court
committed reversible error by refusing to admit evidence relating to an indemnity
obligation addressing potential environmental liability.

In its third issue, Caffe Ribs argues that, given the
State’s focus on Caffe Ribs’s failure to obtain a certificate of completion, the
trial court reversibly erred by excluding evidence of the State’s interference
with remediation activities.

In its fourth issue, Caffe Ribs argues that the trial
court committed harmful error when it excluded Rorick’s testimony contradicting
the State’s assumption that the property could not be developed for up to eight
years.

In its fifth issue, Caffe Ribs claims that the trial
court reversibly erred by admitting Dominy’s expert opinion because it was
based on the improper assumption the property could not have been developed for
eight years and, thus, led to an improperly applied discount rate and
improperly calculated market value.

In its sixth issue, Caffe Ribs contends that it is
entitled to a new trial because a substantial portion of Dominy’s testimony is
missing from the reporter’s record.[3]

In its seventh issue, Caffe Ribs asserts that the trial
court’s exclusion of Caffe Ribs’s appraisal expert Farenthold constituted
harmful error.

Finally, in its eighth issue, Caffe Ribs asks this
court to reverse and render judgment in its favor.  It argues that, because
Dominy’s market value opinion constituted incompetent and inadmissible
evidence, the only competent market value evidence before the jury was the
testimony of its appraisal expert Robinson, who concluded the property’s market
value was $9.9 million.

Generally, when a party presents an issue that would
result in rendition, an appellate court should address that issue first.  Bradleys’
Elec., Inc. v. Cigna Lloyds Ins. Co., 995 S.W.2d 675, 677 (Tex. 1999) (per
curiam).  Caffe Ribs’s rendition request in its eighth issue rests on the
premise that, without Dominy’s testimony, the only evidence of value is
Robinson’s testimony that the property was worth $9.9 million.  Caffe Ribs’s
complaint on appeal relates only to the part of Dominy’s opinion that rested on
a discounted cash flow analysis.  Caffe Ribs does not challenge Dominy’s
testimony that, if the property were on the market clean and ready for
development, it would sell for $10 per square foot, or a total of
$3,276,330.21.  Thus, even absent Dominy’s valuation based on the discounted
cash flow analysis, there is conflicting evidence on the value of the
property.  Under these circumstances, rendition would not be appropriate even
were we to agree with Caffe Ribs on the issue of Dominy’s discounted cash flow
analysis.  See Wegner v. State, 829 S.W.2d 922, 923 (Tex. App.—Tyler
1992, writ denied) (remanding when landowners’ experts presented two
after-taking valuations of property).  Accordingly, we overrule Caffe Ribs’s
eighth issue.

We turn now to Caffe Ribs’s second issue because it
is dispositive.

B.     Exclusion
of Evidence Regarding Weatherford’s Responsibility for Environmental Costs

In issue two, Caffe Ribs contends that “although the State
argued that the market value would be significantly affected by potential environmental
liability and remediation costs, the trial court unfairly prevented Caffe Ribs
from demonstrating third-party indemnity for such liability and minimal costs
of remediation.”  Caffe Ribs’s complaint encompasses the court’s exclusion of
evidence relating to Weatherford’s indemnification agreement with Caffe Ribs’s
seller, under which Weatherford was responsible for remediation of the
contamination it had caused.  Additionally, Bost testified during an offer of
proof that Texas Commission on Environmental Quality files identified
Weatherford as the party responsible for remediation costs, and that
Weatherford was responsible before the date of the taking to the property owner
and to any prospective purchaser of the subject property.

The scope of the trial court’s ruling is not disputed
on appeal.  As set forth above, the court called Caffe Ribs’s counsel to the
bench after he first elicited Robinson’s testimony that Weatherford was the
responsible party.  On at least two occasions thereafter, the court warned
Caffe Ribs away from this topic.  The court confirmed on the record that it had
ruled that evidence of the responsible party for remediation was inadmissible. 
The court answered “correct” when Caffe Ribs’s counsel stated:  “I think it’s
fair to say — correct me if I’m wrong — that the Court has ruled the
responsible party, the responsible party for remediation is inadmissible.” 
Later during this discussion, Caffe Ribs’s counsel stated:  “But your Honor,
it’s the pink elephant in the courtroom.  Everybody’s going to think it’s going
to cost money and everybody’s going to think it’s going to cost whoever owns
the property money.”  The court responded:  “But that’s not an issue in the
case.  The issue is what was the fair market value on that date.  The issue is
not how much is it going to cost to clean up the property.  That’s not the
case.”

Determining whether to admit or exclude evidence lies
within the trial court’s sound discretion.  Bay Area Healthcare Grp., Ltd.
v. McShane, 239 S.W.3d 231, 234 (Tex. 2007); Interstate Northborough
P’ship v. State, 66 S.W.3d 213, 220 (Tex. 2001); see Whirlpool Corp. v.
Camacho, 298 S.W.3d 631, 638 (Tex. 2009).  A trial court exceeds its
discretion if it acts in an arbitrary or unreasonable manner or without
reference to guiding rules or principles.  See Bowie Mem’l Hosp. v.
Wright, 79 S.W.3d 48, 52 (Tex. 2002).  When reviewing matters committed to
the trial court’s discretion, a court of appeals may not substitute its own
judgment for the trial court’s judgment.  Id.  An appellate court must
uphold the trial court’s evidentiary ruling if there is any legitimate basis
for the ruling.  Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35,
43 (Tex. 1998).

To reverse a judgment based on a claimed error in
admitting or excluding evidence, a party must show that the error probably
resulted in an improper judgment.  Tex. R. App. P. 44.1(a)(1); Interstate
Northborough P’ship, 66 S.W.3d at 220.  In determining whether the excluded
evidence probably resulted in the rendition of an improper judgment, we review
the entire record.  Interstate Northborough P’ship, 66 S.W.3d at 220.  

 

I.       Was
the exclusion of evidence erroneous?

The sole issue tried below was the subject property’s
market value.  This appeal focuses on the scope of evidence relevant to this
inquiry.

Texas Rule of Evidence 402 provides, “All relevant
evidence is admissible, except as otherwise provided by Constitution, by
statute, by these rules, or by other rules prescribed pursuant to statutory
authority.  Evidence which is not relevant is inadmissible.”  “‘Relevant
evidence’ means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.”  Tex. R. Evid. 401.

The State argues that evidence of Weatherford’s
agreement to pay in connection with environmental contamination of the subject
property is not relevant to determining that property’s market value.  The State
contends this evidence is irrelevant because the State focused at trial on the
effect that delaying development during the remediation period
would have on a hypothetical purchaser’s valuation of the subject property — not
on the effect that potential liability for remediation and other
expenses would have on a hypothetical purchaser’s valuation.  We reject this argument
because the State’s theory at trial was not so narrowly circumscribed as the
State now suggests on appeal.

According to the State, its trial theory was that
“the property’s market value was affected by the cost of holding the property
while environmental cleanup was completed and development was unlikely, not
that market value would be affected by potential environmental liability and remediation
costs.”  The record belies this contention.  From voir dire through closing
argument, the State addressed the impact of potential environmental liability on
what a buyer would be willing to pay for the subject property.

The State opened its questioning of the venire by
referring to contamination on the property:  “[W]e expect the evidence to show
that this land was heavily polluted, that it had contamination in its soil at
levels of more than three times the levels allowed by the Texas Commission on
Environmental Quality . . . .”  The State referred to contamination entering
the drinking water and the Texas Commission on Environmental Quality’s inquiry into
whether the plume of contamination was migrating.  The State then observed:

            And that’s why we intend to show that the price
that someone would pay for this property, that a willing buyer will pay for
this property, is substantially less than if the property were clean, and that’s
because a willing buyer, we expect the evidence will show, will not only be
worried about what kind of pollution is in that soil, but what will be my
responsibility to other landowners for this contamination.

Later, a venire member asked
whether the property owner contributed to the pollution or knew about it.  Counsel
for the State replied that he had “to leave that up to the evidence,” but the
evidence would show that Weatherford was the main entity that released the
pollution.  After an additional exchange, another venire member who had
business dealings with Weatherford expressed concern about whether
Weatherford’s activities had caused the pollution.  The court then stated: 
“Ma’am, that’s not going to be an issue in this case.  Weatherford agreed that
they caused it.”  This venire member did not serve on the jury.

In cross-examining Caffe Ribs’s appraiser Robinson, the
State elicited testimony that five of the six comparable properties the
appraiser used were not polluted but the subject property was polluted.  The
State had Robinson review a 2004 compilation of the chemicals of concern present
in the subject property’s ground water, eliciting his testimony about the
extent to which levels of these chemicals exceeded the standards for
residential drinking water.  The State also cross-examined Robinson about the carcinogenic
nature of five chemicals listed in a 1994 groundwater report.

The State further questioned Robinson about an
article he had written in which he quoted another author on the subject of
stigma associated with contaminated properties.  Stigma was described as a “negative
intangible” that is caused by “fear of hidden cleanup costs,” “private
liability,” “public liability,” and “[l]ack of mortgageabilty.”  The State’s
cross-examination of Robinson also addressed “other facets of stigma,”
including concerns about “deed recordation of contamination,” “potential
third-party litigation instigated by adjacent property owners,” and the
reluctance of lenders to “fund additional loans due to the unique nature of
contamination and the remediation project.”[4]

The State opened its cross-examination of Klein, the
real estate developer, by eliciting his understanding that the subject property
contained polluted soil, a plume of chlorinated solvent in the groundwater, and
“chemicals of concern” on the date on which the State acquired it.  The State
then elicited Klein’s testimony that he would “look into” whether a particular property
had a plume of underground solvents or chemicals under it, with two concerns
being identification of the responsible party and a determination about whether
the plume was migrating.

During its cross-examination of environmental
engineer Bost, the State asked about contamination levels for each test well
and elicited Bost’s testimony about how these levels exceeded the approved
level for drinking water.  The State also asked about a 17-year cleanup
occurring at another site where contamination migrated and neighboring
residents filed a lawsuit.

In examining its own environmental engineer McMullan,
the State elicited testimony that a carcinogen is “a chemical that leads to
higher incidents of cancer.”  The State then elicited testimony that three of
the five chemicals of concern found in the groundwater on the property in 2004 were
either probable or known carcinogens.

During closing, the State argued:

            “[Robinson’s] opinion of value is directly
contrary to what he said in those articles with regards to the fact that you’ve
got to take into consideration contamination.  You’ve got to take into
consideration stigma.

            You’ve got to take into consideration that
you’ve got a file, a deed recordation down at the courthouse saying that the
property’s contaminated.

            He also talked to you a little bit and admitted
that there were carcinogens in the soil.  There were contaminants that were
potentially cancer causing. . . .

*    *    *

            What would a buyer do if a buyer came to this
property and saw that it had an underground storage tank on it?  What would a
buyer do if that buyer found out, just as you-all have seen, that there was
soil around that underground storage tank that was polluted, that was
contaminated, that was contaminated in excess of the levels allowed by the TCEQ?

*    *    *

            What would a buyer do if that buyer found out
that the groundwater under this property was in a plume and that in that plume
there was [sic] chlorinated solvents in excess of the levels allowed by the
TCEQ? Would that discount the property?  Yes, they would. They certainly would.
 Any reasonable buyer would.

The State emphasizes on appeal that its appraiser based
his valuation on a discounted cash flow analysis involving the necessity of
holding the property for eight years before developing it.  However, the record
demonstrates that the State’s theory at trial went beyond delay in development. 
The State’s case was infused with evidence and argument addressing a
prospective buyer’s concern for potential liability for injury to others, and liability
for remediation costs, attributable to the presence of carcinogens and other environmental
contamination on the subject property.

            The admission of
contamination evidence in this eminent domain proceeding is not challenged in
this appeal.  Therefore, we need not and do not decide the relevance of
evidence addressing environmental contamination, potential liability for such
contamination, remediation costs, or a third party’s agreement to pay for
remediation of such contamination in all cases addressing the market value of contaminated
property that has been taken through eminent domain.[5]

We hold as follows:  If a party relies upon admitted evidence
relating to contamination and concerns about potential environmental liability in
connection with determining the market value of contaminated property that has
been taken through eminent domain, then the existence of a third party’s agreement
to pay costs associated with such contamination also is relevant and admissible
in determining what a hypothetical buyer would pay to a hypothetical seller for
that property.  See City of Harlingen v. Sharboneau, 48 S.W.3d 177, 185
(Tex. 2001) (“In Texas condemnation law, market value properly reflects all
factors that buyers and sellers would consider in arriving at a sales price.”);
cf. Heddin v. Delhi Gas Pipeline Co., 522 S.W.2d 886, 888 (Tex. 1975)
(Fear is relevant to proof of damages when “there is a basis in reason or experience
for the fear; . . . such fear enters into the calculations of persons who deal
in the buying and selling of similar property; and . . . [there is] [d]epreciation
of market value because of the existence of such fear.”).

On this record, Weatherford’s indemnity obligation was
relevant to stigma based on “fear of hidden cleanup costs,” “private
liability,” “public liability,” and “potential third-party litigation
instigated by adjacent property owners;” to a prospective buyer’s concern for its
“responsibility to other landowners for this contamination;” and, in the words
of the State’s closing argument, to the “discount” that “any reasonable buyer”
would demand upon learning that “the groundwater under this property was in a
plume and that in that plume there [were] . . . chlorinated solvents in excess
of the levels allowed by the TCEQ.”  See Primrose Operating Co. v.
Senn, 161 S.W.3d 258, 263 (Tex. App.—Eastland 2005, pet. denied) (quoting
appraiser’s definition of stigma as “‘the resistance of the market place to the
purchase’” and “‘a margin that . . . any purchaser of the property would like
to have above the actual cost’” of remediation; stigma attaches because “the
cost to cure is generally imprecise and may cost more than expected”).

Accordingly, we conclude the trial court abused its
discretion in excluding evidence relating to the Environmental Remediation Agreement
and Weatherford’s indemnity obligation under that agreement.

            II.        Was the exclusion of evidence
harmful?

After reviewing the entire record, we cannot conclude
that exclusion of the evidence was harmless.  See Interstate
Northborough P’ship, 66 S.W.3d at 220.  The jury found the market value of
the property to be $4.5 million, or $13.77 per square foot.[6]  This amount was
more than the State’s valuations of the property as contaminated ($681,000) or
clean and ready for development ($3,276,330).  It was, however, considerably
less than Caffe Ribs’s evaluation of $9.9 million, premised on a conclusion the
contamination had no effect on the market value of the property.[7]

Based on these valuations, the State contends any
error in exclusion of evidence of the Agreement was harmless because “[t]he
jury’s verdict of $4,500,000, or approximately $13.75 per square foot, was
within the range of testimony as if the property were unimpaired by any environmental
conditions.  The trier of fact has the discretion to award damages within the
range of the evidence presented at trial.”  The State relies on cases analyzing
the sufficiency of the evidence — not the effect of exclusion of evidence on
the verdict.  See Lindgren v. Delta Invs., 936 S.W.2d 422, 425 (Tex.
App.—Austin 1996, writ denied); Howell Crude Oil Co. v. Donna Refinery
Partners, Ltd., 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996,
writ denied); City of Houston v. Harris Cnty Outdoor Adver. Ass’n, 879 S.W.2d
322, 334 (Tex. App.—Houston [14th Dist.] 1994, writ denied)

The existence of “some evidence” to support the
verdict is not the test for harm in this context.  Instead, a reviewing court examines
the entire record and asks whether the evidence at issue was directly related
to the central issue in the case or whether the judgment turned on the excluded
evidence.  See State v. Cent. Expressway Sign Assocs., 302 S.W.3d
866, 874 (Tex. 2009) (exclusion of evidence harmful because evidence was
directly related to central issue in case, i.e., value of condemned
property); Tex. Dep’t of Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000)
(challenge to evidentiary rulings usually requires complaining party to show judgment
turns on particular evidence excluded or admitted and reviewing court must
review entire record to make this determination).  As discussed above, the
emphasis during the State’s case on a prospective purchaser’s potential
environmental liability underscores the importance of the excluded evidence.

Additionally, when the trial court’s exclusion of
evidence creates a false impression or unfairly skews the trial in favor of one
party, reviewing courts have concluded the exclusion is harmful.  See, e.g.,
Durbin v. Dal-Briar Corp., 871 S.W.2d 263, 270–71 (Tex. App.—El Paso
1994, writ denied), disapproved on other grounds by Golden Eagle Archery,
Inc. v. Jackson, 24 S.W.3d 362, 372 & 372 n.4 (Tex. 2000); Trans-State
Pavers, Inc. v. Haynes, 808 S.W.2d 727, 732–34 (Tex. App.—Beaumont 1991,
writ denied); W. Co. of N. Am. v. Grider, 626 S.W.2d 923, 927–28 (Tex.
App.—Fort Worth 1982, writ denied).  The Supreme Court of Texas has allowed
that evidence may be admissible to offset a false impression left by the
opposing party’s evidence.  See Horizon/CMS Healthcare Corp. v. Auld, 34
S.W.3d 887, 906 (Tex. 2000).

In the present case, the State exploited evidence of
contamination on the property and the effect it might have on a prospective
buyer.  Excluding evidence of Weatherford’s agreement to indemnify present and
future owners of the property created a false impression that a potential buyer
would have to shoulder the burden of addressing the contamination, including
exposure to suit from neighboring property owners if the contamination were to
migrate off the property.  The State relied on this impression by suggesting — through
questioning, evidence, and argument — that this threat would depress the
property’s market value for reasons independent of delay in development.

The State correctly observes that the trial court did
not exclude all evidence of Weatherford’s responsibility for remediation and
remediation costs.  However, the false impression is not overcome by a single glancing
reference to Weatherford’s responsibility during trial.  As set forth above,
Robinson referred once to the Weatherford Environmental Remediation Agreement
on redirect; immediately after he did so, the trial court called the parties to
the bench and this line of questioning ceased.  The court subsequently warned
Caffe Ribs that it was approaching a prohibited matter when it tried to elicit
testimony from Klein on the issue.  The court sustained the State’s objection
to Caffe Ribs’s question to Bost about the responsible party.

Nor is this false impression cured by the admission
of State’s Exhibit No. 216, a chart providing the State’s computation of the
subject property’s value as of August 25, 2005.  The State notes that this chart
listed “$0” as the annual cost of “Environmental Remediation & Monitoring”
for the subject property from 2005 through 2012.  Consistent with the trial court’s
evidentiary rulings, however, there is no discussion in the record of this
figure in relation to Weatherford.  In any event, inclusion of this figure in
an exhibit does not address the evidence and argument discussed above relating
to stigma or a potential purchaser’s concern for liability to adjacent
landowners. 

For the preceding reasons, we hold that the trial
court abused its discretion in excluding evidence of the Environmental
Remediation Agreement while admitting evidence of contamination and that exclusion
of the evidence was harmful.  We therefore sustain Caffe Ribs’s second issue.

Conclusion

Having sustained Caffe Ribs’s second issue, we
reverse and remand for further proceedings consistent with this opinion.  Given
our disposition of the second and eighth issues, we do not address Caffe Ribs’s
remaining issues. 

                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

Panel consists of Justices
Anderson, Frost, and Boyce.

 









[1] Officers of both
Weatherford U.S., Inc. and its successor, Weatherford Enterra U.S., L.P.,
signed the Agreement.





[2] During the hearing on
motions in limine, Caffe Ribs moved to strike a portion of Dominy’s appraisal
based on a projection of value eight years into the future.  The court observed
that Caffe Ribs had not filed a motion to exclude expert testimony under E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995).  The
court allowed that Caffe Ribs could object to Dominy’s testimony, but overruled
the motion to strike.  During Dominy’s testimony, Caffe Ribs objected to
testimony regarding the discounted cash flow analysis and supporting documents
on grounds that this evidence was conjectural and speculative.  The court
overruled Caffe Ribs’s objections.





[3] A supplemental reporter’s
record containing the missing testimony was filed in this court on July 7, 2009,
a few weeks after Caffe Ribs filed its initial brief.  Therefore, we do not
consider Caffe Ribs’s sixth issue.

 





[4] Caffe Ribs’s appraiser
defined “stigma” as “a perception of a condition of a property that could cause
a reduction in market price.”  He did not conclude that a stigma was applicable
to the subject property.





[5] The parties have not
cited and we have not located Texas case law specifically addressing these
issues in the context of eminent domain.  Courts in at least 13 states have
adopted varying approaches to determining the admissibility of evidence
concerning environmental contamination of property taken in eminent domain
proceedings and responsibility for remediation of that contaminated property.  See
Moorhead Econ. Dev. Auth. v. Anda, 789 N.W.2d 860, 877-884 (Minn. 2010)
(collecting cases).  Facing an issue of first impression under Minnesota law,
the Minnesota Supreme Court adopted a “modified exclusion approach” under which
evidence of remediation costs is not admissible, but evidence of the reduction
in value caused by stigma attributable to environmental contamination is
admissible.  Id. at 883 (“[E]vidence of contamination of the property
being taken can be admitted and considered, but only to the extent necessary to
determine the value of the property ‘as remediated’ — namely, if there is any
loss of value to the property due to the stigma of the contamination.”); see
also 260 N. 12th St., LLC v. State of Wis. Dept. of Transp., No.
2009AP1557, 2010 WL 3547218, 2010 WI App 138, ¶23 (Wis. Ct. App. Sept. 14,
2010) (“[W]e conclude that evidence of contamination and related remediation
costs is admissible in eminent domain cases in Wisconsin.  Environmental
contamination and the need to remediate the contamination is relevant to fair
market value and, therefore, it is relevant to a determination of just compensation
. . . .”) (citation and footnote omitted).





[6] An acre contains 43,560
square feet.  The subject property therefore contains approximately 326,700
square feet.  Robinson calculated the value of the property at $31.00 per
square foot before subtracting for demolition costs.





[7] The total of $13.77 per
square foot also is less than the selling price for Caffe Ribs’s least
expensive uncontaminated comparable property ($19.25 per square foot) and the
least expensive contaminated property ($24.00 per square foot).